# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:07cr109-01 (RMC) |
| | ) | Hon. Rosemary M. Collyer |
| E-GOLD, LTD, | ) | Sentencing Date: Nov. 20, 2008 |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## E-GOLD, LTD.'S MEMORANDUM IN AID OF SENTENCING AND INCORPORATED POSITION WITH RESPECT TO SENTENCING FACTORS

Defendant, e-gold, Ltd. through undersigned counsel, hereby files this memorandum in anticipation of its sentencing on November 20, 2008. On July 21, 2008, defendant, e-gold, Ltd., through its organizational representative Douglas Jackson, pled guilty to one count of conspiracy in violation of Title 18, United States Code, Section 371 and one count of conspiracy to launder monetary instruments in violation of Title 18, United States Code, Section 1956. The advisory sentencing guideline calculation is undisputed and places the defendant at offense level 32. Pursuant to U.S.S.G. § 8C3.3, e-gold, Ltd. requests this Court waive the Stipulated Fine ($3,738,387.30) so that it can continue to operate in compliance with applicable laws and its Plea Agreement with the government. As articulated in the status report filed on November 6, 2008 the costs associated with compliance efforts commenced prior to the plea in this case has consumed a considerable portion of e-gold, Ltd.'s working capital. A fine in **any** amount will "substantially jeopardize the continued viability of the organization."[1]

---

[1] Section 8C.3.3(b) of the United States Sentencing Guidelines states:

> The court may impose a fine below that otherwise required by § 8C2.7 (Guideline Fine Range – Organization) and § 8C2.9 (Disgorgement) if the court finds that the organization is not able and, even with the use of a reasonable installment schedule, is not likely to

## INTRODUCTION AND BACKGROUND

e-gold, Ltd. was established in 1999 to assume responsibility for the roles of Issuance and Settlement for the e-gold system, an Internet payment system initially launched in 1996 by Dr. Jackson, the founder of Gold & Silver Reserve (G&SR). While G&SR is in the business of exchanging e-gold and other e-metals for different national currencies, e-gold, Ltd. focuses its business on the issuance of this digital currency backed by gold bullion for Internet payments and the settlement of e-gold transfers from one e-gold account holder to another. Accordingly, e-gold is integrated into an account based payment system that enables individuals to use gold as money. Specifically, the e-gold payment system allows one account holder to transfer value to another e-gold account in a medium of exchange that is denominated in the perfect value equivalent of physical gold. Since e-gold is denominated in standard weight units, and backed by a 100% reserve of physical bullion, not the US dollar, or any other national currency, which are susceptible to political conditions, its units are precise, internationally accepted, and able to transcend geographic borders and currency exchange calculations. Dr. Jackson's vision when creating e-gold was to "establish a currency that could be [maintained] with a governance model [that] render[ed] it immune to debasement by all, including those administering it, and to bring new opportunities to the global economy."[2] As noted in the Pre-Sentence Investigation Report, the e-gold digital currency has been lauded in publications such as Barron's, The Financial Times and Wired magazine.[3]

---

become able to pay the minimum fine required by § 8C2.7 (Guideline Fine Range – Organization) and § 8C2.9 (Disgorgement). *Provided,* that the reduction under this subsection shall not be more than necessary to avoid substantially jeopardizing the continued viability of the organization.

[2] Pre-Sentence Investigation Report for E-gold, Ltd., page 17-18, paragraph 56.
[3] Id.

e-gold, Ltd. is organized as a virtual company, which contracts with other companies to perform the actual operational and fiduciary roles. G&SR serves as the contractual Operator for the e-gold system. It provides technical support for e-gold, Ltd.'s website and both human resources and customer service duties. e-gold, Ltd. has three additional contractors. Brinks (located in London) and Transguard (a division of Emirates Air located in Dubai) provide vaults where gold bullion is stored and a third party escrow agent controls the physical disposition of the gold bullion. Dr. Jackson, Barry Downey, and Reid Jackson are the three directors of e-gold, Ltd.

### THE OFFENSE

On July 21, 2008, defendant, e-gold, Ltd., through its organizational representative Douglas Jackson, pled guilty to one count of conspiracy in violation of Title 18, United States Code, Section 371 and one count of conspiracy to launder monetary instruments in violation of Title 18, United States Code, Section 1956.

(1)    <u>Conspiracy to operate an unlicensed money transmitting business</u>

According to the Statement of Offense, adopted by defendants e-gold, Ltd. at the plea before this Court on July 21, 2008, between October 2001 and December 2005, e-gold, Ltd. operated an unlicensed money transmitting business in violation of 31 U.S.C. § 5330. Specifically, e-gold, Ltd., along with G&SR, offered a payment system to the public in the form of "e-gold," a digital currency they created. In order to conduct transactions in e-gold, it was necessary for a customer to open an e-gold account via the e-gold website. A customer could obtain e-gold by exchanging some amount of national currency for e-gold through a company or individual offering such exchange services.

G&SR, after devolving the core e-gold functionality onto e-gold, Ltd. (effective January 1, 2000), offered its own exchange service called "OmniPay."

e-gold, Ltd. generated revenue from e-gold customer accounts in two principal ways. First, on every transfer of e-gold from one account to another, a specified spend fee was deducted from the recipient account, in e-gold. Second, a maintenance fee (called an "agio" fee) was deducted monthly, in e-gold, from each account in an amount based on the average daily value in that account. Because this operation qualifies as a "money transmitting" business under 18 U.S.C. § 1960, e-gold, Ltd. and G&SR were required to register with the federal government, the District of Columbia, and several other jurisdictions, which they did not do. As set forth in this memorandum and in the status report, e-gold, Ltd. has an application pending with the federal government to be registered as a Money Transmitting Business.

(2)    Conspiracy to commit money laundering

According to the Statement of Offense, between October 2001 and December 2005, in the District of Columbia and elsewhere, e-gold, Ltd. conducted financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is child exploitation, wire fraud (investment scams) and access device fraud (credit card and identity theft). Although the company took some steps towards ascertaining whether accounts it identified as suspicious were in fact committing crimes, those steps were not adequate. Specifically, on numerous occasions when employees of G&SR, the Operator, discovered that a customer was involved in activity that appeared to be unlawful, that is, questionable investment schemes, it would require the customer to submit paperwork for the purpose of validating its identity and

4

establishing that the customer was not an affiliate of the e-gold operation, but then allowed the customer to resume operating once the paperwork was received rather than closing the account.  Also, although the company would regularly place a zero "value-limit" on accounts it believed to be engaged in criminal activity, that value-limit only prevented that account from receiving further spends, but did not limit the ability of the account holder to spend funds already in the account, exchange those funds out into national currency, or transfer those funds to another e-gold account.  e-gold, Ltd. has admitted to this court that it failed to properly and adequately monitor these accounts it deemed suspicious.

## E-GOLD, LTD.'S HISTORY OF COOPERATION WITH LAW ENFORCEMENT

For years e-gold, Ltd. has cooperated with law enforcement agencies in the investigation of online crime, specifically with identity theft, credit card fraud, and child pornography.[4]  For example, in February 2006, e-gold, Ltd. investigators discovered what appeared to be an identity theft and credit card fraud scheme (hereinafter "Cardersmack Project").  Dr. Jackson contacted the credit card companies and the U.S. Postal Inspector's Office.  In an email to Mr. Crabb of the U.S. Postal Inspector's Office, Dr. Jackson provided the whereabouts of the cyber-criminal, as well as the details of specific bank transactions involved in the criminal activity.  (A representative  sampling of emails exchanged between Dr. Jackson and Mr. Crabb regarding the Cardersmack Project are attached as Exhibit 1).  Dr. Jackson also helped Mr. Crabb draft an order to submit to the court which would maximize the amount of information e-gold, Ltd. could provide in

---

[4] In an effort to limit repetition among pleadings, a more detailed account of actions e-gold, through its officers, has taken to combat online fraud, child pornography, and other criminal acts is included in the Sentencing Memoranda of Douglas Jackson and G&SR, filed with this Court on November 14, 2008.

response to the Order.[5]   Because of this cooperation, Mr. Crabb invited Dr. Jackson to attend an Interpol conference the following week regarding online criminal activities, indicating that e-gold, Ltd. has resources that could be helpful to law enforcement in combating this problem.   Throughout the investigation, Dr. Jackson provided additional, detailed information on the names, address and accounts for the suspected criminals.   An email from U.S. Postal Inspector William Schambura to Dr. Jackson describes the level of cooperation Dr. Jackson provided; in it, Mr. Schambura writes, "Impressive investigative work…impressive."[6]

Based on Dr. Jackson's help with the first investigation in February, 2008, the following month, Mr. Crabb asked Dr. Jackson to assist in a second investigation regarding credit card fraud (hereinafter "Segvec and Maksik Project").   Dr. Jackson agreed and again provided detailed information for the transactions and accounts requested to the government.   Mr. Crabb's response was once again unequivocally grateful.   He wrote, "Doug, this information on Segvec is outstanding….I think that we can definitely get the legal process in place to go after [S]egvec and other related account info[rmation]."   (Emails between Dr. Jackson and Mr. Crabb regarding the "Segvec and Maksik Project" are attached as Exhibit 2).   Dr. Jackson continued to provide information to Mr. Crabb, which helped lead to the indictment of both individuals involved in the scheme.   (Indictments are attached as Exhibit 3 and 4, respectively).

In addition, e-gold, Ltd. has been an active ally of the National Center for Missing and Exploited Children (NCMEC).   Dr. Jackson corresponded regularly with

---

[5] See Exhibit 1A, email from Dr. Jackson to Mr. Crabb dated February 9, 2006, describing to Mr. Crabb in detail, what should be included in a court order or subpoena "to ensure you get all pertinent information"; see also Exhibit 1B, email from Mr. Crabb to Dr. Jackson asking him to "[P]lease review the attached court order language….Please let me know your opinion, if we are to present you with such an order."
[6] See Exhibit 1C, email from William Schambura to Dr. Jackson dated April 12, 2006.

Cybertipline Director John Shehan, as well as with staff member Michelle Collins.  At a meeting in August 2005 with Mr. Shehan and Ms. Collins, Dr. Jackson demonstrated e-gold's capabilities for blocking e-gold, Ltd. accounts suspected of child pornography activities.  Specifically, using an NCMEC computer, Ms.Collins opened a suspicious webpage that claimed to accept e-gold [a site that NCMEC investigators had known about but, for unexplained reasons, had never informed e-gold, Ltd. of despite entreaties from Dr. Jackson to NCMEC to aid in identifying such criminal sites]. Dr Jackson then demonstrated how to determine if the site was indeed accepting e-gold and how to immediately determine the e-gold account number of the suspect. With e-gold fraud investigator Randy Trotter on the telephone (Mr. Trotter recently was made the Anti-Money Laundering Program Compliance Officer for e-gold, Ltd.), e-gold, Ltd. blocked the account in real-time.  Ms. Collins expressed her enthusiasm for e-gold, Ltd.'s capabilities and admitted that Visa and Mastercard did not have this same capability.

Furthermore, on an on-going basis, e-gold, Ltd. voluntarily funded accounts for NCMEC's investigators to use to track down child pornography buyers.  No subpoenas or court orders were issued to e-gold, Ltd. for this information, instead, e-gold, Ltd. was willing and eager to provide the assistance.

e-gold, Ltd., through Dr. Jackson, also developed a positive working relationship with Matt Dunn of Immigration and Customs Enforcement (ICE), beginning in Fall 2006. Dr. Jackson described Mr. Dunn as the "leading law enforcement expert on how child porn is bought and sold," and e-gold, Ltd. strived to work with Mr. Dunn on a consistent basis through 2006 and 2007.

Dr. Jackson, an e-gold, Ltd. Director, regularly attended conferences and seminars devoted to eradicating child pornography.  In November 2005, Dr. Jackson sought out Kevin Zuccatto, who at the time was the head of the Australian High Tech Crime Center (AHTCC), at the Belfast anti-child pornography conference.  Dr. Jackson wanted to discuss with Mr. Zuccatto his frustration with law enforcement agencies' unwillingness to engage with e-gold, Ltd. in tracking down child pornography offenders.  Subsequent to that conversation, in October 2006, Mr. Zuccatto reached out to Dr. Jackson in an effort to investigate Australian buyers of child pornography, especially those who use the e-gold payment system to do so.  Dr. Jackson was happy to comply and e-gold, Ltd. delivered the requested information.

Finally, even the government has acknowledged efforts taken by e-gold, Ltd., through Dr. Jackson, to eliminate online criminal activity.  In a letter from Assistant United States Attorney, Laurel Loomis Rimon, to e-gold, Ltd. and G&Sr's counsel (Mr. Mitchell Fuerst and Andrew Ittleman), she writes, "while [your] cooperation is appreciated, we want it to be clear that, to date, we have extended no offer of immunity (of any sort) for any information he may provide."  (The letter from Laurel Loomis Rimon to Dr. Jackson dated May 2, 2006 is attached as Exhibit 5).  This reinforces e-gold, Ltd.'s assertion that it has worked cooperatively with law enforcement for many years to eradicate online crime. Dr. Jackson provided assistance to law enforcement knowing that he would not receive the traditional 5k1.1 consideration.

### E-GOLD, LTD.'S COMPLIANCE WITH THE PLEA AGREEMENT

Prior to entering into the Plea Agreement with the government in this case, e-gold, Ltd. began bringing its operations into compliance with all applicable laws.

Although a detailed Status Report on Activities Undertaken by Defendants to Comply with All Provisions of the Plea Agreement was submitted to this Court on November 5, 2008, and an Internal Status Report for Ongoing Compliance Actions through October 18, 2008 is attached to this Memorandum as Exhibit 6, it is worth elaborating on some of those efforts in this Sentencing Memorandum, especially since the defendants have undertaken these efforts at substantial cost, time and resources.  (Status Report on Activities Undertaken by Defendants to Comply with All Provisions of Plea Agreements, excluding attachments, is attached as Exhibit 7).

      (1)    <u>Registration as a money services business</u>

e-gold, Ltd. and G&SR agreed that they would register with the Department of the Treasury (FinCEN) pursuant to 31 U.S.C. § 5330 and 31 C.F.R. § 103.41.  On July 21, 2008, before any of the parties had even signed the Plea Agreement, the law firm of Fuerst Humphrey Ittleman submitted to the Department of the Treasury registration forms on behalf of e-gold, Ltd. and G&SR.  On August 8, 2008, the Department of the Treasury sent notices acknowledging the registrations.  (Copies of the federal registration forms submitted for each company are attached as Exhibit 8).

In addition, both companies agreed not to operate without a money transmitting license in States that require licensing of businesses engaged in money transmitting. They agreed that within thirty days of entering the Plea Agreement, they would submit applications to obtain State licenses in States that require such licensing or submit requests for advisory opinions that the companies are not required to be licensed.  Within this thirty day time period, Fuerst Humphrey Ittleman sent to each state an application for

a license or a letter seeking an advisory opinion on the companies' obligations to be licensed.

Finally, the companies agreed to obtain any State license (or advisory opinion) within six months of entry of the Plea Agreement, or else they would stop conducting business in that State.  The Plea Agreement was filed on July 21, 2008, therefore, the six month period expires on January 21, 2009.  As of the date of this filing, the companies are actively engaged with all of the respective State agencies in obtaining the necessary license or advisory letter stating there is no licensing requirement.  Several states have already advised e-gold, Ltd. that it does not need a license to operate, while others have sought additional information or requested that one or both companies cease operating further until they have completed the licensing process.  At a significant expense and use of resources, e-gold, Ltd. has complied with each such request, and in states where they were required to cease operations pending licensure, the company devised, developed, tested and deployed enhancements to its application software that would allow it to preclude citizens from those particular states from using e-gold.

(2)    Service of process

Both companies agreed to accept service of process at G&SR's business location in Melbourne, Florida, and any other location in the United States where the company operates, including the location of any owner or principal, regardless of whether that is the location of the principal place of business, incorporation, or registration.  The companies have complied with this provision of the Plea Agreement.  In fact, as recently as August 28, 2008, e-gold, Ltd. has accepted service of seizure warrants, issued by this Court,  at the Melbourne address.  (Two warrants are attached as Exhibits 9 and 10).

(3)    <u>Anti-money laundering program</u>

e-gold, Ltd. agreed to establish and maintain a Bank Secrecy Act compliance program, including an anti-money laundering program with internal controls, independent testing and other measures to detect and report potential money laundering, terrorist financing and other suspicious activity.  Pursuant to 31 U.S.C. § 5318(h), this compliance program should include, at a minimum: (i) the development of internal policies, procedures, and controls; (ii) the designation of a compliance officer; (iii) an ongoing employee training program; and (iv) an independent audit function to test programs.

Shortly after signing the Plea Agreement, e-gold, Ltd. retained KPMG to develop an anti-money laundering program and Bank Secrecy Act compliance program.  The policies, procedures and controls recommended by KPMG, and implemented by e-gold, Ltd., are documented in a report issued by KPMG on October 17, 2008.  This detailed report was provided to the Court and Renee Moses Gregory, the assigned PSR writer on November 7, 2008, and is referenced in the Status Report on Activities Undertaken by Defendants to Comply with All Provisions of Plea Agreements.  Both e-gold, Ltd. and G&SR have appointed Randy Trotter as their anti-money laundering (AML) compliance officer.  Mr. Trotter currently is in the process of becoming a Certified Anti-Money Laundering Specialist, as certified by the Association of Certified Anti-Money Laundering Specialists.  (*See* http://www.acams.org).

As part of its compliance program, e-gold, Ltd., through KPMG, provided training to its employees, officers and directors.  Together, e-gold, Ltd. and G&SR have a weekly AML systems meeting where employees discuss AML issues and are given

additional training or education materials.  One employee, Ms. Katrina Jackson, is in the

process of becoming a Certified Fraud Examiner so she can provide additional expertise

to e-gold, Ltd. in handling these matters.  Also, one of e-gold, Ltd's Directors, Dr.

Jackson, has attended several national conferences, attended by industry experts,

academia, government officials and law enforcement officers, on how to identify and

combat the most significant threats related to online money transmitting.  Finally, e-gold,

Ltd. and G&SR's Bank Secrecy Act and AML compliance plan provides for an

independent audit of both companies' AML program, including testing, annually.  The

plan also provides for an internal Quality Assurance Program to test, on a periodic basis,

the Department's key functions (i.e. CIP, OFAC, SAR reporting) to ensure that these

processes are functioning properly and that any problems may be dealt with in a timely

manner.

      (a)    <u>Consultant</u>

e-gold, Ltd. agreed that they would retain an independent consultant to assist in

establishing an appropriate AML program and to ensure compliance with money

laundering laws.  As explained above, KPMG was hired to provide this service.  (A copy

of KPMG's report was submitted to this Court on November 7, 2008).

      (b)    <u>User agreement and website disclaimer</u>

In the Plea Agreement, e-gold, Ltd. promised to modify its User Agreement and

prominently publish a disclaimer on its website explaining that the use of the e-gold

system for criminal activity is not tolerated and that e-gold, Ltd. is an entity subject to

U.S. financial regulations.  On July 21, 2008, the date of the plea, e-gold, Ltd.'s Director,

Dr. Jackson, prominently posted on the e-gold website a statement titled "A New

Beginning."  (*See* http://blog.e-gold.com/2008/07/a-new-beginning Status Report on

Activities Undertaken by Defendants to Comply with All Provisions of the Plea

Agreements.html).  The statement publicly acknowledged that e-gold, Ltd. is a financial

institution as defined by U.S. law and is regulated as such.  It advised that e-gold, Ltd.

had submitted an application to FinCEN (Financial Crimes Enforcement Network) to be

registered as a money services business and would be seeking licensure in all states that

required it.  In addition, the statement explained that e-gold, Ltd. and G&SR wanted to

"make something clear that should have been made more emphatically clear long ago.

Use of the e-gold system for criminal activity will not be tolerated."  The statement

informed customer that the e-gold Account User Agreement had been amended to include

provisions that an e-gold "user agrees to not use e-gold in any manner that violates the

laws of whatever jurisdiction to which the User is subject" and to give e-gold, Ltd. the

right to freeze and take other actions relating to accounts suspected of criminal activity.[7]

    (c)    <u>Customer identification</u>

In the Plea Agreement, e-gold, Ltd. agreed to establish procedures for verifying

customer identification pursuant to 31 U.S.C. § 5318(l) and 31 C.F.R. § 103.125.  Since

the Plea Agreements, G&SR (the operator of the e-gold system) entered an agreement to

engage the services of Bridger Insight, who specializes in the implementation of

advanced identity verification systems, to assist both Companies in the verification of

identifying information provided by U.S. applicants.  As soon as that engagement is

confirmed and implemented, Bridger Insight will provide its services (a Customer

Identification Program "CIP") to e-gold, Ltd. through a contract with G&SR.

---

[7] For specific provisions added to the User Agreement, see the Status Report on Activities Undertaken by Defendants to Comply with All Provisions of Plea Agreements, page 8-9.

In October, e-gold, Ltd. took additional steps in implementing its new Customer Identification Program by deploying a Document Upload interface, a critical element in the new program.  Since all e-gold account users are now required to submit documentation of identity and residential address using a government issued photo ID and a second form of identification such as a utility bill,[8] the Document Upload program permits customers to electronically scan and upload images of these documents to the website.

In addition to implementing procedures to verify customer identification, e-gold, Ltd. agreed that within ninety days of the entry of the Plea Agreement, no new e-gold or other digital currency account shall be opened, or if that is not reasonable and practicable, permitted to engage in any transactions, without being in compliance with 31 U.S.C. § 5318(l) and 31 C.F.R. § 103.125.  Specifically, the agreement stated that all existing e-gold, OnmiPay, or other digital currency accounts must be brought into compliance with 31 U.S.C. § 5318(l) and 31 C.F.R. § 103.125 or closed within ninety days.

On July 21, 2008, e-gold, Ltd. suspended new e-gold account creation pending development and deployment of its new, compliant Customer Identification Program. The company then began an accelerated development program, which involved both proprietary software development and the purchase of additional computer hardware. Because of the multitude of programming and infrastructure demands, along with the complex requirements of each state, and these provisions of the Plea Agreement, on October 19, 2008, e-gold, Ltd. effectively froze all accounts until they can verifiably be

---

[8] These two requirements are part of e-gold, Ltd.'s new, compliant, Customer Identification Program.  e-gold now requires all existing and new customers to submit the four essential elements of a compliant CIP: the User's name, address, date of birth, and a government-issued personal identifying number such as a tax ID number or Social Security number.

in compliance with 31 U.S.C. § 5318(l) and 31 C.F.R. § 103.125.  As of November 14, 2008, customers are only allowed to upload identification documents, no account is capable of entering transaction orders or receiving Spends.[9]

Before e-gold, Ltd. can reinstate Spends, in compliance with this section of the Plea Agreement, as interpreted by e-gold, Ltd's AML Consultant, it must first deploy software enhancements that: (i) restrict all e-gold users from non-OECD countries to monthly throughput limits of $1,000 (USD-equivalent) and (ii)  prevent e-gold users located in Russia, Ukraine, Latvia, Nigeria, Vietnam, Belarus, Romania, Albania and Bulgaria from any Spend activity whatsoever until additional risk-based safeguards are implemented.

Finally, within thirty days of the entry of the Plea Agreement, as part of its anti-money laundering program, e-gold, Ltd. agreed to hire an outside vendor that could proactively search the Internet for instances where e-gold is being used for criminal purposes.  On August 20, 2008, e-gold, Ltd. hired Cyveillance, Inc. (located at 1555 Wilson Blvd. Arlington Va. 22209-2405; http://www.cyveillance.com), to provide this service.  Cyveillance has devised a program that will monitor the Internet to detect situations where e-gold is being used for criminal purposes.  Currently, Cyveillance is conducting training for G&SR employees in the use of this program.

      (d)      OFAC compliance

e-gold, Ltd. agreed that within ninety days of the Plea Agreement all of its existing and newly created accounts would be in compliance with the U.S. Department of Treasury's Office of Foreign Asset Control (hereinafter "OFAC") regulations or closed. In August, 2008, OFAC issued a license to e-gold, Ltd. and G&SR, thereby empowering

---

[9] Spends is the term e-gold uses to describe transactions and exchanges of e-gold between customers.

them to dispose of the value frozen in e-gold accounts since 2006 relating to country sanctions.  The license imposes an August 2009 deadline for final disposition of this frozen value. Counsel has been in ongoing discussions with  Laurel Loomis Rimon and Victoria Rosenthal, general counsel for OFAC, regarding the most expeditious way to dispose of current accounts that are closed but not yet liquidated.  Meanwhile, in conjunction with e-gold, Ltd.'s robust new CIP, both companies plan to check the identifying information for all new and existing users against an external database for listings of any OFAC Specially Designated Nationals.  The companies also have established a procedure for evaluating possible hits for purposes of either excluding false positives or qualifying true positives for escalation and reporting.  Procedures also have been implemented for re-scrubbing e-gold customer data with any changes in the OFAC database, as well as routine monthly re-scrubbing.

Until these procedures are fully implemented, each e-gold account will remain effectively frozen.  Also, each account will remain effectively frozen until the account owner has complied with the new customer identification requirements and OFAC checks.  Therefore, from and after October 19, 2008, through November 14, 2008, all e-gold accounts are effectively frozen and incapable of engaging in transactions until they are fully compliant.

In an effort to fully comply with this section of the plea agreement without running afoul of OFAC regulations, counsel for defendant spoke with AUSA Laurel Loomis Rimon and Victoria Rosenthal, Counsel for OLFAC  twice in the past ten days. The purpose of this call was to determine the best way to liquidate e-gold, Ltd. accounts held by individuals in Iran without violating the terms of the plea agreement or OFAC

regulations.  On the call, OFAC counsel explained she had to meet with her client before she could give defendants specific instructions on how to comply with this section of the plea agreement.  As of the date of the filing of this Memorandum, defendant's have not received instructions from OFAC; however, in an effort to expedite compliance, e-gold, Ltd. has begun the process of moving all the identified Iranian accounts into one single account so it is easier to liquidate when OFAC provides instructions for how to execute this liquidation.

(e)    <u>Suspicious activity reports</u>

e-gold, Ltd. agreed that pursuant to 31 U.S.C. § 5318(g) and 31 C.F.R. § 103.20 it would report suspicious transactions detected on or after entry of the Plea Agreement. The company has developed, deployed and begun using an incident tracking protocol that enables systematic capture and documentation of investigative incidents from their initial detection via transaction monitoring, through evaluation and possible elevation to Suspicious Activity Report (SAR) filing.  Employees of the Operator (G&SR) have been trained by KPMG staff in methods for tracking suspicious activity and preparing SARs. To date, Mr. Trotter has filed eleven SARs.  The company will continue to be vigilant and report all such activity, as required by law and this Plea Agreement.

(f)    <u>Audit</u>

e-gold Ltd. agreed to hire an independent auditor to identify all gold bars held by the e-gold operation and to conduct an accounting of the e-gold book transfer system to confirm that the amount of e-gold in circulation is fully backed by gold bullion held in storage.  On July 17, 2008, the independent auditor Stout Causey & Horning, P.A., submitted to the government an audit report verifying that all gold bars identified by e-

17

gold, Ltd. as backing the e-gold in circulation are maintained in licensed repositories in storage facilities in London and Dubai.  (A copy of that report is attached as Exhibit 11).

## E-GOLD, LTD'S INABILITY TO PAY A FINE[10]

In the Plea Agreement, e-gold, Ltd. and the government agreed on a Stipulated Fine in the amount of $3,738,837.30.[11]  However, e-gold, Ltd. reserved the right to argue for a reduction of the Stipulated Fine based on the company's inability to pay pursuant to USSG § 8C3.3.[12]  Currently, e-gold, Ltd.'s liquid assets[13] are $3,108,200.41 and it's liabilities are $38,344.69, however, a majority of those assets ($2,819,893.47) are in the form of notes receivable, and a majority of the notes receivable are owed by G&SR ($1,819,893.47).  (A copy of both e-gold, Ltd. and G&SR's Liquid Assets and & Current Liabilities as of November 6, 2008 are attached as Exhibits 12 and 13, respectively).[14] Therefore, excluding notes receivable, e-gold, Ltd.'s liquid assets are only $288,307.01. Since the combined monthly operating expenses of e-gold, Ltd.and G&SR are approximately $258,773.92,[15] e-gold, Ltd.'s total liquid assets cannot cover a single month of operating expenses.  (A list of the Combined Monthly Expenses of e-gold, Ltd. and G&SR is attached as Exhibit 14).

Perhaps an even clearer example of e-gold, Ltd.'s inability to pay a fine is a snapshot of its Estimated Revenues and Expenses from May 2007 through October 2008,

---

[10] The numbers included in this section of the memorandum, and Exhibits referenced herein, are different from ones previously submitted to the government because they represent the most current snapshot of financial data for both companies.

[11] See Plea Agreement, pg. 2-3, paragraph 3.

[12] Id. at pg. 3, paragraph 4.

[13] This figure also includes certain fixed assets of e-gold, Ltd., such as office furniture and computer hardware.

[14] A detailed list of both Companies' individual "Accounts Payable" are attached to Exhibits 12 and 13, as Exhibit 12A and 13A.

[15] This monthly expense amount does not include the $231,901 balance that the companies currently owe to KPMG for compliance consulting services, the $100,000 balance that the companies currently owe its auditor for auditing services, or the $104,025 that the companies will owe Cyveillance for cyber intelligence services on or before December 18, 2008.

which shows that e-gold, Ltd.'s expenses outweighed revenues by $1,002,194.68 during this period.  (e-gold, Ltd.'s Estimated Revenues and Expenses Sheet from May 2007 through October 2008 is attached as Exhibit 15).  After the government's seizure in April 2007, there was a steady loss of monthly revenues as demonstrated by last month's gross spend fees total of $3,941.05 compared to May 2007's gross spend fees total of $241,838.88.[16]  This represents a 98% drop in monthly spend fee revenue.

Furthermore, in order to comply with each term of the Plea Agreement in an expedited manner, e-gold, Ltd.has committed to spend more than $624,000.00.[17] Significant additional expenses will also be necessary for the companies to comply with the Plea Agreement over the next several years.  A fine in **any** amount will essentially bankrupt both companies given their recent precipitous and steady decline in revenue and large expenditures for compliance. Since bankrupting the companies undermines the spirit of the Plea Agreement and violates U.S.S.G. § 8C.3.3(b), the Court should not impose a fine in this case.

## STATUTORY SENTENCING FACTORS

Section 3553 of Title 18 sets out seven factors to be considered in imposing sentence and directs the Court to impose a sentence that is "sufficient but not greater than necessary."  18 U.S.C. §3553(a).  In this case, consideration of these factors justifies a waiver of any fine.

---

[16] See Exhibit 15.
[17] This is the amount the Companies still owe KPMG, Cyveillance and Berman Hopkins for consulting and compliance services.  Contracts with each of these consultants are attached as Exhibits 16, 17 and 18, respectively.

(1)   The "nature and circumstances of the offense and the criminal history and characteristics of the defendant" (§3553(a)(1))

As set forth in the preceding section, this factor weighs heavily in favor of the Court waiving a fine.  As noted in the PSR report, there are no discernible victims or injured parties in this case[18] and since signing the Plea Agreements, defendants have worked tirelessly, dedicating a significant amount of resources and time, to complying with all the requirements of the Agreement.  In addition, none of individual defendants have ever been in trouble with the law before this investigation. The defendants' decision to enter into a disposition aborted what would have been a very costly and prolonged trial for all parties.

(2)   "The need for the sentence imposed" (§3553(a)(2))

Here, there can be no question that a sentence of a waived fine would satisfy the "needs" addressed in this subsection.  The spirit of the Plea Agreement, and the purpose of U.S.S.G. 8C3.3, is to not bankrupt e-gold, Ltd. and put it out of business, since it provides a useful service to the global community.[19]  The purpose of both is to allow e-gold, Ltd. to continue, or essentially restart, its business while being in compliance with all federal and state laws.  For that reason, the government allotted more than $500,000 for e-gold, Ltd. to use in implementing compliance programs.  A fine in the amount of the Stipulated Fine, or any amount, would bankrupt the company and be contrary to the spirit of the agreement, which was to empower and enable e-gold, Ltd., within the bounds and requirements set forth by the government, and agreed to by the parties in the plea

---

[18] See Presentence Investigation Report, pg. 24, paragraph 87.
[19] In an effort to limit repetition among pleadings, a more detailed account of the benefits e-gold, Ltd. and G&SR's services provide the global community, see Sentencing Memoranda of G&SR, Douglas Jackson, Barry Downey, and Reid Jackson.

agreement, to re-start its business successfully and legally.  Sentencing Guidelines and statutory sentencing factors.  Therefore, the court should not impose a fine in this case.

        (3), (4), (5)  <u>Available sentences and the Sentencing Guidelines (§3553(a)(3-5)</u>

        There is no question that waiving the fine is authorized under the Guidelines, specifically U.S.S.G. 8C3.3, and the terms of the Plea Agreement.

        (6)     <u>"The need to avoid unwarranted sentence disparities"</u>

        This factor is not applicable to sentencing in this case.

        (7)     <u>Restitution</u>

        The government and the PSR have confirmed that restitution is not an issue in this case.[20]

### GENERAL PRINCIPLES APPLICABLE TO DETERMINING THE APPROPRIATE SENTENCE FOR ORGANIZATIONS

        As noted above, U.S.S.G. § 8C3.3 states, "[I]f the court finds that the [defendant] organization is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay the minimum fine required," the Court may impose a fine "below that otherwise required."  A company is considered unable to pay when "the payment of that fine would substantially jeopardize the continued existence of the organization."  U.S.S.G. § 8C3.3, Application Note 1.  Because of this, the sentence should be "designed so that the sanctions imposed upon organizations and their agents, taken together, will provide just punishment, adequate deterrence, and incentives for organizations to maintain internal mechanisms for preventing, detecting, and reporting criminal conduct."  U.S.S.G., ch. 8, introductory cmt.

---

[20] <u>See</u> Presentence Investigation Report, pg. 24, paragraph 87; Plea Agreement pg. 4, paragraph 7.

(1)     "Substantial Jeopardy"

In this case, e-gold, Ltd. has demonstrated that it is unable to pay a fine.  A fine in any amount will "substantially jeopardize" both it and G&SR's continued existence. Imposing a fine based on potential future earnings is speculative, at best, in this case, since there is no certainty that either of these two Companies will be able to continue, even if no fine is imposed.  Therefore, the Court should not consider intangible future earnings when determining the fine.  *United States v. Seale,* 20 F.3d 1279, 1286 (3d Cir. 1994)("In attempting to predict future ability to pay, district courts must be realistic and must avoid imposing a fine when the possibility of a future ability to pay is based merely on chance").  Any analysis of the Companies' ability to pay a fine should also include the costs of compliance and the Companies' substantial, existing debt.  *United States v. Patient Transfer Serv., Inc.,* 465 F.3d 826, 827 (8th Cir. 2006)("A defendant's financial condition must be considered in determining the amount of a fine").  *See also United States v. Nathan,* 188 F.3d 190, 213 (3d Cir. 1999)(holding that the court should consider the entirety of defendant corporation's financial resources "before setting a fine that may consume all of defendant's assets").

(2)     The Sanctions Imposed Should "Provide Just Punishment" And "Incentives to Prevent Future Criminal Conduct"

The Companies have already taken substantial steps, in accordance with the Plea Agreement, to "maintain internal mechanisms for preventing, detecting, and reporting criminal conduct."  Because these compliance and preventative measures have consumed a significant amount of time and resources, both Companies also have received sanctions that provide "just punishment and adequate deterrence," thereby satisfying the requirements of the Sentencing Guidelines.

**CONCLUSION**

For the reasons set forth above, e-gold, Ltd. respectfully requests this court not impose a fine in accordance with U.S.S.G. § 8C3.3.  Such a sentence is appropriate under the advisory sentencing Guidelines and compelled by a full consideration of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,


_____/s/_____
Bernard S. Grimm
D.C. Bar No. 378171
COZEN O'CONNOR
1627 I St., NW, Suite 1100
Washington, DC 20006
Phone: (202) 912-4800
Email: bgrimm@cozen.com

23

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of November, 2008, a copy of Defendant e-gold, Ltd.'s Sentencing Memorandum was served on all parties via ECF and a copy was sent via first-class postage prepaid mail to the following non-ECF recipient:

Renee Moses-Gregory
United States Probation Officer
E. Barrett Prettyman US Courthouse
333 Constitution Avenue, NW
Room 2800
Washington, DC  20001


_____/s/_____
Bernard S. Grimm
D.C. Bar No. 378171
COZEN O'CONNOR
1627 I St., NW, Suite 1100
Washington, DC 20006
Phone: (202) 912-4800
Email: bgrimm@cozen.com