**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal Action No. 07-109(ABJ)** |
| **E-GOLD LIMITED, et al.,** | |
| **Petitioners.** | |

**PETITIONERS' REPLY IN SUPPORT OF THEIR**
**PETITION FOR WRIT OF ERROR CORAM NOBIS**

Petitioners e-gold, Ltd. ("EGL"), Gold & Silver Reserve, Inc. ("GSR"), Douglas L. Jackson, Barry K. Downey, and Reid A. Jackson (collectively, "Petitioners") respectfully submit this reply in support of their Petition for Writ of Error Coram Nobis (the "Petition") (ECF No. 211) and in response to the Government's opposition ("Opposition") (ECF No. 214).

The Petitioners asked this Court to vacate, with prejudice, their convictions in this preceding because the Government failed to meet its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) when it suppressed highly material exculpatory and impeachment evidence. Specifically, the Government intentionally suppressed a Florida OFR Legal Opinion[1] that determined that the Petitioners were not required to obtain money transmitter licenses under Florida law and that the Government further instructed Florida OFR officials not to have contact with the Petitioners regarding this matter,

---

[1] Capitalized terms not defined herein have the meanings assigned to them in the Petition.

thereby ensuring this information would not be available to the Petitioners in their defense. The Government's wrongful actions also prevented this Court from considering this evidence when it was ruling on the Petitioners' Motion to Dismiss [ECF No. 110]. The suppression of this exculpatory and impeachment evidence had a material impact on the Petitioners decision to plead to the charges against them—pleas that were not fully informed because of the Government's action.

In response, the Government admits that it has not even reviewed its file in this case because of COVID-19. Instead, it contends that such a review is unnecessary because, they allege, the Florida OFR Legal Opinion is not relevant as the Petitioners were not charged with violations of Florida law, but were charged with violations of 18 U.S.C. § 1960, and that Petitioners Douglas Jackson, Barry Downey and Reid Jackson were charged with violating the District of Columbia's Money Transmitters Act ("MTA"), D.C. Code § 26-1001 *et seq.*, by engaging in the business of money transmission without a license in violation of D.C. Code § 26-1002. The Government further responds that the Petitioners waited too long to challenge their 2008 convictions and that it is "not clear" that the Petitioners would have received a favorable opinion from the District of Columbia's Department of Insurance, Securities, and Banking ("D.C. DISB") had they sought one during the course of the proceedings in this case. The Government is wrong in each respect and the Petition should be granted.

I.    **The Government's File Must Be Reviewed as it is Likely to Reveal the Extent of the Government's Suppression of *Brady* material.**

The fact that the Government has not even reviewed its own file in this case, nor talked to the prosecutors involved, is telling.  While the Government argues that it is not necessary to undertake these basic tasks before asking this Court to deny the Petition, the Petitioners have provided this Court with prima facie evidence of the Government concealing exculpatory and impeachment evidence from the Petitioners and ultimately from this Court.  *See* Petition at 4-10, exhs. 1-11.

The Government offers no evidence to rebut their conduct. The Government goes so far as to say that "it is not clear that the defendants would have received a favorable opinion from the D.C. DISB, exonerating them from D.C. Code violations, had they sought an advisory opinion."  ECF No. 214 at 2. Given that the Government has not even reviewed its own file, it begs the question as to whether the Government itself sought such an opinion from the D.C. DISB and, if it did, whether that too was suppressed because it was favorable to the Petitioners.  The Government's reticence to review its own files also raises the question of whether the Government affirmatively avoided asking D.C. DISB for an opinion for fear that it would come to the same conclusion as Florida OFR.  Regardless, the existence of the Florida OFR Legal Opinion would have allowed the Petitioners to challenge the very basis of the Government's charges and the disclosure of the Florida OFR Legal Opinion would have provided the court with evidence that belied the veracity of the 'assumed facts' alleged in the Indictment.  A review of the Government's file would likely shed further light

on the extent of the Government's suppression of evidence favorable to the Petitioners.

What is certain, and uncontroverted, is that the Government sought an opinion from the Florida OFR on Petitioners' status under Florida law and, when the Government was informed that the Florida OFR Legal Opinion would contradict the Government's theory of the case, the Government took the extraordinary act of intentionally suppressing that opinion and instructing Florida OFR not to have any contact with the Petitioners. Before any further action can be taken in this case, all *Brady* material in the Government's file should be turned over to the Petitioners and the Petitioners should be allowed to supplement their Petition with this additional evidence.

## II. The Government Cannot Now Argue that Petitioners Have Waited Too Long to Challenge their Convictions when any Delay is Directly and Solely Attributable to the Government's Suppression of *Brady* Evidence.

In the Opposition, the Government speciously argues that the Petition should be denied because, they contend, Petitioners should have attacked their convictions sooner because Petitioners purportedly could have obtained advisory opinions from Florida OFR or D.C. DISB notwithstanding the Government's concealment of Florida OFR's ongoing review of Petitioners' businesses as Petitioners' Home State Regulator.[2] By this audacious line of argument, the

---

[2] The Conference of State Bank Supervisors ("CSBS") has recognized a special role for "Home State Regulators" in the regulation of financial businesses that are physically located in one state but conduct business in many states. *See, e.g.*, CSBS, *Protocol for Performing Multi-State Examinations*, at 4 (Jan. 2012), https://www.csbs.org/sites/default/files/2017-11/MSB-Protocoll010512.pdf. Under this definition, Florida OFR was Petitioners' Home State Regulator

Government effectively faults Petitioners for failing to discover exculpatory evidence despite the Government's concerted efforts to conceal that evidence from them. Contrary to its protestations, the Government cannot shift to Petitioners its burden of disclosing *Brady* material. Petitioners were entitled to rely on the Government's fraudulent representations that it had produced all the *Brady* material in its possession as of April 7, 2008, and therefore could not have attacked their convictions before filing the Petition.

While the Government faults Petitioners for not "pursu[ing] this claim diligently," D.C. Circuit law is clear that "the prosecution bears the burden of disclosing any exculpatory evidence in its possession, and it is no response to a *Brady* claim that defense counsel could have learned of the evidence through 'reasonable pre-trial preparation.'" *United States v. Nelson*, 979 F.2d 123, 133 (D.D.C. 2013) (quoting *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 896-97 (D.C. Cir. 1999)). Petitioners had no due diligence obligation to independently discover the Florida OFR Legal Opinion that the Government concealed from them, and Petitioners therefore had "valid reasons . . . for not attacking the[ir] conviction[s] sooner". *United States v. Hansen*, 906 F. Supp. 688, 693 (D.D.C. 1995). Much like the discovery rule in a fraud case, the Government cannot now hide behind the argument that it took too long for the Petitioners to challenge their convictions because it was the Government who affirmatively suppressed this evidence and its existence from the Petitioners. *See*

---

because Florida was the only state in which EGL or GSR maintained a physical presence.

*Nelson*, 979 F.2d at 133. Indeed, the Government not only hid the Florida OFR Legal Opinion from the Petitioners and ultimately this Court, it also instructed Florida OFR not to communicate with the Petitioners. *See* ECF No. 211-3.

This is particularly true where, as here, the Government affirmatively represented it had produced not just all of its *Brady* material but even *extra* material "out of an abundance of caution." *See* Petition exh. 11 at 2 [ECF No. 211-12]. As noted in the Petition, on April 7, 2008, counsel for the Government sent Petitioners a letter representing,

> In accordance with the amended Scheduling Order, the following is responsive to Item #2, which requires the Government to produce, to the extent it has not already been produced, all material pursuant to Brady v. Maryland, Giglio v. United States, and their progeny by April 7, 2008. Although we do not believe that the following information is materially exculpatory, we disclose it out of an abundance of caution.

Petition exh. 11 at 2. Despite representing it had complied with and even exceeded its *Brady* obligations, the Government did not reveal the existence of the Florida OFR Legal Opinion or the existence of Florida OFR's review of Petitioners' business under Florida's money transmitter statutes. *See* Petition at 9. Petitioners were entitled to rely on the Government's representations that it had produced all the *Brady* material in its possession. *See Nelson*, 979 F. Supp. 2d at 133-34. As the Supreme Court has held,

> Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed. . . . A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process. . . . Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation.

*Banks v. Dretke*, 540 U.S. 668, 695-96 (2004) (internal citations omitted). Having defrauded Petitioners by concealing the Florida OFR Legal Opinion from them, the Government cannot now prevail by blaming Petitioners for failing to see through its deception.

The Supreme Court's holding in *Banks* and this Court's holding in *Nelson* are particularly relevant because, contrary to the Government's specious arguments, the basis of the Petition is not merely that Petitioners did not previously discover valuable exculpatory evidence but that the Government violated Petitioners' constitutional rights by concealing that exculpatory evidence from them. Petitioners do of course contend that the Florida OFR Legal Opinion is exculpatory evidence and highly probative with respect to the charges for which they were convicted, as discussed in detail in Section III, *infra*. But the "error of the most fundamental character" that justifies coram nobis relief in this action is not simply that Petitioners did not have access to this critically important exculpatory evidence before they made their plea agreements but that the Government *suppressed* that evidence and thereby violated Petitioners' constitutionally-protected right to due process. *See* Petition at 22. While the Government argues, albeit in a mealy-mouthed fashion,[3] that Petitioners could

---

[3] Notably, the Government undermines its own argument on this point even in the course of making it by casting doubt on whether Petitioners would have obtained favorable advisory opinions from D.C. DISB or Florida OFR had they sought those opinions. *See* Opposition at 14. While the Government is not barred from offering arguments in the alternative, to the extent the Government is correct Petitioners would not be able to obtain such favorable opinions on their own, such difficulty would only aggravate the Government's misconduct in concealing the favorable opinion it actually possessed.

have obtained the equivalent of the evidence the Government suppressed by other means, the Government makes no argument that Petitioners could have discovered the Government's own deprivation of Petitioners' constitutional rights in a more expeditious fashion. Thus, in response to the actual question posed by the second prerequisite for coram nobis relief—i.e., whether there was an earlier point in time Petitioners could have brought this attack on their convictions—the Government is silent. That silence is dispositive on this issue.

Additional considerations also demonstrate the Government's contentions are baseless. The Government baldly misrepresents the record in alleging that Petitioners did not fulfill the conditions of their plea agreements, which required them to either "submit applications to obtain State licenses in States that require licensing of businesses engaged in money transmitting or submit a request for an advisory opinion from such a State that the [defendant] is not required to be licensed". Opposition at 12 (internal quotation omitted). Contrary to these assertions, Petitioners *did* fulfill this condition of their plea agreements by submitting applications for state money transmitting licenses. *See* Petition at 20. Petitioners' applications were denied because of their convictions in this proceeding, as demonstrated by the denial letter attached as an exhibit to the Petition. *See* Petition exh. 13 [ECF No. 211-14]. The Government's attempt to defend its conduct with yet more misrepresentations of the record should not be credited by the Court.

Finally, it is striking that the Government concedes that "a favorable opinion . . . could have provided potentially beneficial exculpatory material to

[the Petitioners'] defense."[4]  ECF No. 214 at 11.  But the Government argues that it is "particularly glaring" that the Petitioners did not seek an advisory opinion from either D.C. DISB or Florida OFR at the time.    This is misdirection. Regardless of whether the Petitioners' sought such an opinion from Florida OFR, such an opinion existed at the time, the Government knew about it and actively concealed its existence from Petitioners by failing to produce the Florida OFR Legal Opinion and instructing Florida OFR not to have any contact with the Petitioners.  As a result, even if the Petitioners had asked Florida OFR, it would likely have either ignored or declined the Petitioners' request because of the Government's prejudicial acts.  The Government cannot have it both ways.

It is the height of hypocrisy for the Government to argue that the Petition should be denied because the Petitioners waited too long to challenge their convictions.  The material that serves as the basis for this Petition was actively suppressed from the Petitioners by the Government that now seeks to hide behind the delay.  The Petitioners wish they had this material at the time they were being prosecuted as it would have been material to their defense— particularly their Motion to Dismiss and any subsequent trial—and they would not have pled guilty to these charges with the benefit of this evidence.  But they did not have this evidence, and their pleas were secured because of the

---

[4]    The Government argues that the Florida OFR Legal Opinion is not exculpatory because D.C. and federal law were the bases of the Petitioners prosecution.  ECF No. 214 at 16.  This ignores the statement from the Florida OFR Legal Opinion that the author of the Opinion had "no knowledge that any other federal or state regulator had held this activity [E-Gold and G&SR activities] is within the jurisdiction of their money transmitter code."

Government's obfuscation.

### III.    The Florida OFR Opinion Is Exculpatory Evidence the Government was Required to Produce to Petitioners

While the Government faults Petitioners for failing to obtain the Florida OFR Legal Opinion by their own means, it also contends it was not obligated to produce the Florida OFR Legal Opinion to Petitioners because, according to its own specious assertion, the Florida OFR Legal Opinion is not exculpatory. *See* Opposition at 16-17. The Government offers several bases for this spurious conclusion, none of which are sufficient to overcome the clearly exculpatory nature of a legal opinion by the initial, and perhaps the only, state regulatory agency approached by the Government[5]—in the only state in which the defendants ever maintained a physical location of any sort, employees or computer servers—concluding that Petitioners do not operate a money transmitting business in a case where Petitioners were charged with operating an unlicensed money transmitting business.

For *Brady* purposes, "[e]xculpatory evidence is 'that which would tend to show freedom from fault, guilt or blame.'" *Nelson*, 979 F. Supp. 2d at 131 (quoting *United States v. Blackley*, 986 F. Supp. 600, 603 (D.D.C. 1997)); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (noting the first *Brady* element is that "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"). Evidence is exculpatory if it could cast a reasonable doubt on an element that the Government would

---

[5] And which the government informed, in its initial contact, "Violation of State Law is Violation of Federal Law 18 USC 1960". *See* Petition, exh. 1.

need to prove beyond a reasonable doubt at trial or if it could be used to support an affirmative defense available to the defendant. *See Nelson*, 979 F. Supp. 2d at 131-32 & n.6.

The Government argues the Florida OFR Legal Opinion is not exculpatory essentially because it is concerned with Florida law, rather than with D.C. or federal law. This is mistaken because the similarities between the Florida OFR Legal Opinion and the DISB Opinion Letter demonstrate the value of the Florida OFR Legal Opinion as evidence that Petitioners were not required to obtain money transmitter licenses under D.C. law. *See* Petition at 23. As the Government admits, "a state law violation can serve as the basis for violating [18 U.S.C.] § 1960." Opposition at 16; *see* 18 U.S.C. § 1960(b)(1)(A) (defining "unlicensed money transmitting business" in part as a money transmitting business that "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law"). Whether Petitioners were required to obtain money transmitter licenses for EGL or GSR under D.C. law was therefore an essential element of the § 1960 charges against Petitioners.

Whether Petitioners were required to obtain money transmitter licenses was also an essential element of the D.C. MTA charges against them because those charges were explicitly premised on allegations that EGL and GSR were required to obtain money transmitter licenses under D.C. law and had not done so. Crucially, the Government has not disputed Petitioners' contention that the grounds relied upon by D.C. DISB in the DISB Opinion Letter were "essentially

the same grounds underlying the Florida OFR Legal Opinion." Petition at 23. As such, had the Government not illegally suppressed the Florida OFR Legal Opinion, Petitioners could have presented it as evidence that neither EGL nor GSR were required to be licensed as money transmitters under D.C. law, an essential element of the charges against them. The Florida OFR Legal Opinion was therefore "highly exculpatory" as Petitioners originally noted in the Petition, *see* Petition at 23, and the Government was required to produce the Florida OFR Legal Opinion to Petitioners. The Government's fraudulent concealment of the Florida OFR Legal Opinion in contravention of their *Brady* obligations was a violation of Petitioners' constitutionally-protected due process rights.

## IV. The Government's Contentions that the DISB Opinion Letter is "Unpersuasive" Does Not Affect Its *Brady* Obligations

The Government also offers several arguments intended to show that Petitioners have not suffered any prejudice from the Government's fraudulent concealment of the Florida OFR Legal Opinion. The bulk of these arguments center on the DISB Opinion Letter rather than the Florida OFR Legal Opinion itself. The Government argues the DISB Opinion Letter is "unpersuasive" and that D.C. DISB's analysis is not favorable to Petitioners. *See* Opposition at 18-22. Each of these contentions is wide of the mark and amounts to the Government imagining how the Court might have ruled had the 2016 DISB Opinion Letter been presented to it earlier in this 2008 proceeding. The Government's flight of fancy blithely ignores the central reason these matters have come before the Court at this late date: the Government intentionally deprived Petitioners and the Court of the opportunity to consider these matters

by fraudulently concealing the existence of the Florida OFR Legal Opinion. The Court should not allow the Government to excuse its own misconduct by arrogating to itself the discretion to decide what the Court would or would not find persuasive or convincing.

    A.    <u>There Was a Reasonable Probability the Court Would Have Relied on State Regulatory Opinions on This Matter of First Impression</u>

The Government's primary contention that the DISB Opinion Letter is "unpersuasive" rests upon its comparison with Judge Howell's exhaustive analysis of bitcoin's status under D.C. law in *United States v. Harmon*, 2020 WL 4251347 (Jul. 24, 2020). The Government finds fault with D.C. DISB's reliance on Black's Law Dictionary[6] rather than on "other dictionary definitions, the way e-gold was used in the illegal economy, analogous federal case law, or the aims and purposes of money transmitter regulation under the MTA," many of which the Court did consider in *Harmon*. Opposition at 18-19.

The Government's reasoning is fatally flawed because it fails to account for the difficulties the Government itself created by concealing the Florida OFR Legal Opinion for a decade. While Judge Howell's learned opinion in *Harmon* would doubtless have been invaluable to Judge Collyer in her analysis of the issues presented in this proceeding, she could not possibly have relied on an opinion written in 2020 when this case came before her in 2008. In addition to

---

[6] Continuing its pattern of misdirection, the Government wrongly asserts that "The [DISB Opinion Letter] rests entirely on a single definition of the term "money" in Black's Law Dictionary." Opposition at 18-19. The Government failed to mention that DISB Opinion Letter also considered the IRS's treatment of "virtual currency" as property rather than currency. *See* Petition exh. 12 [ECF No. 211-13] at 6.

this timing issue, Judge Collyer's reliance on *Harmon* would have created a difficult circularity problem, as *Harmon* explicitly relies on Judge Collyer's analysis *in this case* and, incredibly, on the existence of Petitioners' own plea agreements. *See Harmon*, 2020 WL 4251347, at *9-*10, *13 (citing *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 92 (D.D.C. 2008); *United States v. E-Gold, Ltd.*, No. 07-cr-109, ECF Nos. 130 (Plea Agreement of R. Jackson), 142 (Plea Agreement of B. Downey)).

The Government's fallacious arguments underscore the deeper problem with the Government's contentions in this regard. In 2008, online payment systems such as e-gold were in their infancy. E-gold was among the first attempts to develop an online payment system whose value was not dependent on currencies issued by national governments.[7] *See* Petition at 1-2. Bitcoin, the digital currency at issue in *Harmon*, did not even exist[8] when Petitioners entered their guilty pleas in this proceeding on July 21, 2008. *See* Petition at 11 (citing

---

[7] As the Government's counsel asserted in the sentencing hearing, "This is a particularly significant case. Digital currencies are on the forefront of international fund transfers. E-Gold is the most prominent digital currency out there. It has the attention of the entire digital currency world. That world is a bit of a wild west right now. People are looking for what are the rules and what are the consequences." Transcript of Sentence, *United States v. E-Gold Ltd.*, Docket No. CR 07-109, at 95 (Nov. 20, 2008). The proper place for determining those "rules" should have been through properly promulgated statutes or regulations to deal with the new "digital currency world," rather than through a criminal prosecution. *See United States v. Lanier*, 520 U.S. 259 (1997). "[A] criminal conviction ought not to rest upon an interpretation reached by the use of policy judgments rather than by the inexorable command of relevant language." *M. Kraus & Bros., Inc. v. United States*, 327 U.S. 614, 626 (1946).

[8] Joshua Davis, *The Crypto-Currency*, THE NEW YORKER (Oct. 3, 2011) (noting bitcoin was created by the pseudonymous Satoshi Nakamoto on January 3, 2009), https://www.newyorker.com/magazine/2011/10/10/the-crypto-currency.

ECF Nos. 130, 133, 136, 139, 142); And e-gold was also, as Judge Howell notes in *Harmon*, one of the Government's first attempts to prosecute an online payment service for alleged non-compliance with federal or state money transmission statutes. *See Harmon*, 2020 WL 4251347, at *13. In this case, Judge Collyer faced the unenviable task of being one of the very first judges to consider the panoply of novel legal issues posed by this new technology. Under those circumstances, there was a reasonable probability that any independent analysis or guidance from state regulatory agencies would have changed the result of the proceedings. By suppressing the Florida OFR Legal Opinion, the Government deprived the Court of the opportunity to avail itself of that guidance.

The Government's duplicitous behavior also deprived Petitioners of the opportunity to accurately evaluate the merits of their own defense. As discussed in Section III, *supra*, and in the Petition, the Florida OFR Legal Opinion was highly exculpatory evidence. Had the Government fulfilled their *Brady* obligations and produced this evidence in a timely fashion, there is a reasonable probability Petitioners would have opted to go to trial rather than pleading guilty. At a minimum, as noted in the Petition, had they been aware of such dispositive evidence, it is unlikely Petitioners would have pleaded guilty to violations of the D.C. MTA in the absence of an adverse determination by D.C. DISB. *See* Petition at 25. The Government's willful violation of Petitioners' due process rights prevented them from making these decisions and in so doing rendered their guilty pleas unknowing and involuntary.

B.    The Government Admits the Rationale of the DISB Opinion Letter
       Applies to Petitioners

The Government goes to considerable lengths to attempt to demonstrate

the DISB Opinion Letter does not apply to Petitioners. However, in the course of

doing so the Government admitted that,

> COEPTIS operated a two party system that was a closed/centralized
> settlement platform that was used to make internet payments.
> National currencies were not received, dispensed, or used on the
> settlement platform. **This aspect is similar to the platform
> operated by the defendants.**

Opposition at 21 (internal citations omitted) (emphasis added). The Government

went on to argue that the addition of Petitioner GSR, through its OmniPay

service, created a "three party business model". *Id.* If the Government's

allegations are credited, under the reasoning of the DISB Opinion Letter GSR

would be required to be licensed as a money transmitter. Even if the Court were

to credit those allegations, however, Petitioner EGL would *not* be required to be

licensed as a money transmitter under the DISB Opinion Letter. The

Government's concession that the position of Petitioner EGL and COEPTIS are

comparable is fatal to its position.

Petitioners' Statements of Offense each refer to EGL as being required to

be licensed as a money transmitter in the District of Columbia, either alone or

in connection with GSR. *See* ECF Nos. 131 at 1-2, 4 (Reid Jackson Statement of

Offense); 137 at 2 (e-gold, Ltd. Statement of Offense); 140 at 2 (Douglas Jackson

Statement of Offense); 143 at 4 (Downey Statement of Offense). Petitioners' plea

agreements also provide that Petitioners were required to concede EGL is a

money transmitting business and that it was required to obtain money

16

transmitting licenses if required under applicable state law, including D.C. law. *See* ECF No. 130 at 3-4 (Reid Jackson plea agreement); 133 at 6-7 (GSR plea agreement); 136 at 6-7 (EGL plea agreement); 139 at 6 (Douglas Jackson plea agreement); 142 at 3-4 (Downey plea agreement). At a minimum, the Government's concession demonstrates a reasonable probability exists that, but for the Government's suppression of the Florida OFR Legal Opinion, Petitioners would not have consented to plea agreements that required acknowledging that EGL and GSR were money transmitters under applicable state law, including D.C. law.

     C.    The DISB Opinion Letter Shows Petitioners Were Not Required to Obtain Money Transmitter Licenses

As previously noted, the Government's core contention on this point is that "defendants are appropriately characterized as operating a three party business model," which they contend under the DISB Opinion Letter's analysis would require Petitioners to obtain a money transmitter license. *See* Opposition at 21. The crux of the Government's argument on this point is its allegation that, "[u]nlike COEPTIS, who required an independent financial institution to convert its customers' virtual currency into national currencies, GSR internalized this process through OmniPay, the business that it owned and operated." *Id.* These allegations fundamentally misapprehend both the arrangement described in the DISB Opinion Letter and the institutional arrangements whereby EGL and GSR dba OmniPay were organized. As Petitioners explained in the Petition, the DISB Opinion Letter describes a segregation of functional roles identical to those employed in the E-gold System, and the DISB Opinion Letter therefore provides

that Petitioners would not have been required to obtain money transmitter licenses under D.C. law.

Contrary to the Government's allegations, EGL and GSR were independent entities in the sense employed in the DISB Opinion Letter. Petitioners pioneered the separation of roles between issuance/settlement and exchange later emulated by so-called 'cryptocurrencies'. The independence and separation between EGL and GSR were defining characteristics of the E-Gold System that ignited its emergence and explosive growth from 2000 onward. Under this rubric, EGL maintained a closed ledger-based system that dealt *exclusively* with e-gold (and other e-metals); EGL never handled any transactions involving national currencies. This feature of EGL fostered the emergence of numerous companies offering their own exchange services between e-gold and national currencies, competing with each other and with GSR. *See* Petition at 2.

This separation of the issuer of e-gold from the business risks of exchange ensured freedom from issuer default risk, a defining imperative of the E-Gold System. To meet that end, from the announcement and beginning of their existence as separate companies in 2000 onward, EGL and GSR's ownership, operations and accounting were kept scrupulously separate from one another. Petitioners were prepared to prove this at trial if the need arose but were deprived of the opportunity to do so by the Government's fraudulent concealment of the Florida OFR Legal Opinion. Had the Government discharged its *Brady* obligations in this case, the revelation of the Florida OFR Legal Opinion would have both alerted Petitioners of this aspect of their defense and allowed

18

Petitioners to better inform the Court of the true institutional arrangements, transactional and business models of EGL and GSR, thereby exposing the disingenuousness of the Government's sophistry in crafting its criminal allegations that purposefully misconstrued these essential facts and circumstances and cast the companies as an agglomerated "e-gold Operation".

This separation of roles also makes clear that, contrary to the Government's argument, Petitioners' business was not a "three party business model" as used in the DISB Opinion Letter. *See* Opposition at 21. According to the DISB Opinion Letter, a three party business model "requires a party to receive money, that is, real currency, in order to purchase the virtual currency, that is later transferred to a third party through the use of an intermediary." *See* Petition, exh. 12 at 7. Contrary to this requirement, EGL *was incapable* of handling transactions involving "real currency" (i.e. national currencies) and could *only* accommodate transfers of e-gold or other e-metals on its platform. E-gold users could only obtain their e-gold via a transfer from another e-gold user, and there was no requirement that this transfer occur in exchange for any amount of national currencies. The Government's argument is therefore unavailing and should not be credited by the Court.

Further underscoring this conclusion, while not referred to by name in the DISB Opinion Letter, COEPTIS's business model contemplated using the services of a company called Fidelis-FX ("Fidelis") to handle exchanges of national currencies and the "AUG" currency that COEPTIS's user base would exchange on its "Global Standard System". *See* DISB Opinion Letter at 1. The relationship

between COEPTIS and Fidelis was the same as the relationship between EGL and GSR. D.C. DISB concluded COEPTIS was "independent" of Fidelis in their respective roles, and therefore would also have concluded EGL and GSR were independent of one another if Petitioners had the opportunity to present them with that question. The Government's argument that the DISB Opinion Letter does not apply to Petitioners is therefore unavailing, and Petitioners were prejudiced by the Government's brazen failure to uphold their *Brady* obligations.

**V.     The Government's Spurious Reference to Other Offenses Alleged in the Indictment Does Not Relieve Them of their *Brady* Obligations**

As a last-ditch effort, the Government contends that coram nobis relief is improper because the Petition does not "proffer[] any defense" to the charges listed in the Indictment that are not related to the money transmitter laws and that Petitioners did not plead guilty to. The Government argues in effect that, because the Florida OFR Legal Opinion is not a silver bullet that unquestionably disposes of every element of every charge brought against Petitioners, the Government should be relieved of its *Brady* obligation to produce the Florida OFR Legal Opinion to Petitioners. The Government's contentions in this regard are a gross misstatement of the standard applicable to petitions for writs of error coram nobis and of the Government's obligations under *Brady* and its progeny.

Most of this ill-starred argument consists of rehashing its previous arguments regarding the Florida OFR Legal Opinion. As noted herein and in the Petition, Petitioners have suffered prejudice as a result of the Government's suppression of the Florida OFR Legal Opinion because that fraudulent

suppression deprived both Petitioners and the Court of the benefit of Florida OFR's legal analysis of what was at the time a novel question of the application of the money transmitter laws to a cutting-edge technological innovation. While the Government speciously argues the Florida OFR Legal Opinion applies only to state law and not to federal law, as discussed *supra* there is a reasonable probability that the Court's analysis of both state and federal law would have been different if the Government had not fraudulently deprived it of the opportunity to consider state regulators' views of these novel questions of law.

The remainder of the Government's spurious argument consists of demanding evidence "that shows that the defendants did not violate § 1956 or the federal prong of § 1960". The Government contends that Petitioners must show they are "innocent" of all the claims alleged against them in the Indictment, even the ones they did not plead guilty to. This is emphatically not the law in this Circuit, either under the law set forth under *Brady* and its progeny or the standards to obtain a writ of error coram nobis.

As this Court explained in *Nelson*, to establish the prejudice element of a *Brady* claim, "[t]he issue in a case involving a guilty plea is whether there is a reasonable probability that but for the failure to disclose the Brady material, the defendant would have refused to plead and would have gone to trial." 979 F. Supp. 2d at 134 (internal quotation omitted). In that case, this Court also emphasized that to meet this standard defendants such as Petitioners do not need to show they would have *prevailed* at trial but only that there was a reasonable probability they would have *gone* to trial. *See id.* at 134-35 (citing

21

*United States v. Hanson*, 339 F.3d 983, 991 (D.C.Cir.2003)). As explained in the Petition, had Petitioners been aware of the Florida OFR Legal Opinion and had the opportunity to seek a similar opinion from D.C. DISB, there was

> a reasonable probability that Petitioners would have opted to go to trial rather than plead guilty to the remaining three counts of the Indictment had they known that they had a complete defense to one of the grounds on which they were alleged to have violated 18 U.S.C. § 1960.

Petition at 25. Contrary to the Government's baseless claims, Petitioners felt confident they could defeat the spurious money laundering charges against them, particularly in view of their exemplary record of cooperating with law enforcement to eliminate the bad actors the Indictment accused them of profiting from. *See* Petition at 3. If Petitioners had favorable state regulatory opinions in hand to wield against the money transmitter charges, there is a reasonable probability they would have foregone any plea agreement and taken their chances at trial. The Government deprived Petitioners of the opportunity to make that choice over a decade ago when it suppressed the Florida OFR Legal Opinion and violated Petitioners' due process rights.

The Government's argument that Petitioners have the burden to prove their "actual innocence" as a condition precedent to obtaining relief on their Petition is little short of absurd. This extraordinary standard applies only to claims that are procedurally defaulted, and the Government has not contended that any of Petitioners' claims are in procedural default. *See Bousley v. United States*, 523 U.S. 614, 623 (1998). The Government also cites no authority for the proposition that this standard applies to a petition for a writ of error coram nobis;

22

the sole authority the Government cites is *Bousley*, which concerned a habeas corpus claim under 28 U.S.C. § 2255. *See id.* Instead, as explained in the Petition, the standard for a writ of error coram nobis requires a showing of "an error of the most fundamental character," which is satisfied here by the Government's *Brady* violation. *See* Petition at 22.

## VI.    The Government's Smear Attempt Against Petitioners Should Not Be Credited By The Court

Lastly, the Government baselessly insinuates that Petitioners actively benefited from child pornography and that this conduct formed the basis for their indictment and prosecution. This is a blatant attempt to smear Petitioners with unsubstantiated allegations of uncharged and unproven conduct in order to misdirect the Court from the Government's own misconduct in this case—hiding exculpatory information from the Petitioners—which is the sole issue now before the Court. These ridiculous allegations, which have nothing to do with the issues before the Court, underscore the weakness of the Government's case and deserve no consideration by the Court.

Incredibly, the Government offers *nothing* to support its scurrilous allegations against Petitioners beyond the bare allegations of the Indictment itself. *See* Opposition at 3-4. As the Government well knows, this shameful attempt to smear Petitioners before the Court has no basis in fact. While the Government evidently intends that these disgraceful accusations will prejudice the Court against Petitioners, in fact they serve as yet more evidence of the Government's malice towards Petitioners and its determination to violate Petitioners' constitutional rights.

23

The Government knows its characterization are utterly baseless because the Government has long been aware of the Petitioners' long and fruitful history of working *with* law enforcement to ferret out illegal conduct that was conducted by others using the E-gold System. Indeed, the Government evidently feared that Petitioners' record of cooperation with law enforcement would damage its case, as it sought to prevent Petitioner Douglas Jackson from highlighting Petitioners' assistance to law enforcement to Florida OFR during its review of Petitioners' obligations under Florida law – the same review that the Government concealed from Petitioners and that is now at issue in this proceeding. *See* Petition, exh. 2. ("You explained that your investigative team did not want to give Mr. Jackson the opportunity to boast about his cooperation in resolving complaints and assisting government regulators."). The Government is also well aware of Petitioners' extensive cooperation with law enforcement, their work with the National Center for Missing and Exploited Children and other similar organizations, and their aggressive pursuit of the United States Secret Service to assist in catching, exposing, and prosecuting child exploitation and other illegal conduct on the E-gold System. *See, e.g.*, Email from Douglas Jackson to Gregory Crabb (Mar. 27, 2006) (attached hereto as **Exhibit 1**) (correspondence between Petitioner Douglas Jackson and U.S. Postal Inspection Service ("USPIS") investigator in which Douglas Jackson assists USPIS in monitoring e-gold transactions of credit card scammers); Email from Gregory Crabb to Douglas Jackson (Jul. 9, 2006) (attached hereto as **Exhibit 2**) (USPIS investigator informs Petitioners that Government counsel "inquir[ed] as to the cooperation that you

24

have provided to the Postal Inspection Service" and describing his proposed response). Contrary to the picture the Government seeks to paint, Petitioners believed then and now that the E-gold System was, before its untimely destruction by this prosecution, the best constructed system to protect against illegal conduct and assist law enforcement in catching predators and other criminals – criminals who now use Bitcoin and other cryptocurrencies to obscure their crimes. But much like the Government did not want Douglas Jackson to highlight Petitioners' active and eager partnership with law enforcement before Florida OFR, the Government now wants to misdirect this Court away from the Government's own misconduct with this baseless smear. The Government's conduct here is beyond the pale, and the Court should not permit the Government to cover its previous duplicity with yet more vile falsehoods.

## VII.  Conclusion

For all the reasons stated herein and in the Petition, Petitioners respectfully request the Court GRANT the Petition and all the relief requested therein.

Respectfully submitted,

/s/ David A. Warrington
David A. Warrington (VSB No. 72293)
KUTAK ROCK LLP
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (202) 828-2437
Facsimile: (202) 828-2488
david.warrington@kutakrock.com
*Attorney for Defendant-Petitioners*

25

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 4th day of November, 2020, a true and correct copy of the foregoing was served via ECF on all counsel of record.

/s/ David A. Warrington
David A. Warrington