UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>E-GOLD, LTD.,<br>GOLD & SILVER RESERVE, INC.,<br>DOUGLAS L. JACKSON,<br>BARRY K. DOWNEY,<br>REID A. JACKSON,<br><br>            Petitioners. | )<br>)<br>)<br>)<br>)<br>)<br>)   Crim. Action No. 07-0109 (ABJ)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER ADOPTING**
**REPORT & RECOMMENDATION**

On July 2, 2020, petitioners filed a petition for writ of *coram nobis*, asking the Court to vacate their convictions with prejudice, which the government opposed.[1]  *See* Pet. [Dkt. # 211]; Opp. to Pet. [Dkt. # 214]; Reply in Supp. of Pet. [Dkt. # 216].  On August 31, 2021, the Court referred the petition to a Magistrate Judge pursuant to Local Rule 59.2 for a report and recommendation.  Minute Order (Aug. 31, 2021).  The Magistrate Judge recommended denying the petition, and petitioners' objections to the Report and Recommendation are pending before the Court.  For the reasons set forth below, the Court will adopt the Report and Recommendation and deny the petition.

---

1  Because the judge who originally handled the case has since retired, the case was reassigned to this Court.  Minute Order (July 6, 2020).

1

**BACKGROUND & PROCEDURAL HISTORY**

Petitioners in this case are two entities that operated an online digital currency system, E-Gold, Ltd. and Gold & Silver Reserve, Inc. ("GSR"), and their three executives: (1) Chairman, CEO, and co-founder Douglas Jackson; (2) co-founder, Secretary, Vice-President, and Director Barry Downey; and (3) Managing Director Reid Jackson. Indictment [Dkt. # 1] ¶¶ 14–18.

In 2005, the government initiated a forfeiture proceeding against bank accounts held by petitioner GSR. *See* Verified Compl. for Forfeiture *In Rem*, *United States v. All Funds Seized from or on Deposit in SunTrust Account Number xxxxxxxxx8359, In the Name of GSR*, 05-cv-2497-RMC [Dkt. # 1] (Dec. 30, 2005) ("*In Rem* Compl."). In that matter, the government alleged that GSR was required to register as a money transmitter with the U.S. Department of the Treasury pursuant to 31 U.S.C. § 5330(a), the District of Columbia Department of Insurance, Securities, and Banking ("DISB") pursuant to the D.C. Money Transmitters Act, and the Florida Office of Financial Regulation ("OFR") pursuant to the Florida Money Transmitter's Code. *See In Rem* Compl. at 7–9.

On April 24, 2007, the government filed this criminal case, alleging a number of violations of federal law and D.C. law, including that petitioners conspired to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 and engaged in the business of transmitting money without a license in violation of section 26-1002 of the D.C. Code. *See* Indictment. It did not allege a violation of Florida law. *See id.*

Petitioners filed a motion to dismiss Counts Two through Four of the indictment. *See* Mot. to Dismiss [Dkt. # 93] (hereinafter "First Mot. to Dismiss"). They argued, among other things, that the term "money transmitting business" under the federal statute, 18 U.S.C. § 1960, only applied to businesses engaged in cash transactions, and, alternatively, that it is ambiguous whether

businesses engaged in non-cash transactions are "money transmitting businesses" so the rule of lenity should apply.[2] *See id.* at 5–12. The court denied the motion. Mem. Op. [Dkt. # 110].

On April 3, 2008, a superseding indictment was filed, again charging petitioners with violations of federal and D.C. law, but not Florida law. Superseding Indictment [Dkt. # 104].

- Count One charged all the petitioners with conspiracy to launder monetary instruments in violation of 18 U.S.C. §§ 1956, 1957. Superseding Indictment ¶¶ 28–48.

- Count Two charged all the petitioners with conspiracy to operate an unlicensed money transmitting business in violation of 18 U.S.C. §§ 371 and 1960. Superseding Indictment ¶¶ 49–76.

- Count Three charged all the petitioners with operating an unlicensed money transmitting business in violation of 18 U.S.C. §§ 1960 and 2. Superseding Indictment ¶¶ 77–78.

- Count Four charged the three individual petitioners with engaging in transmissions of money without a license in violation of D.C. Code § 26-1002. Superseding Indictment ¶¶ 79–80.

Petitioners filed a second motion to dismiss, seeking to dismiss Count Four of the Superseding Indictment on the grounds that the D.C. money transmission statute did not apply to a non-resident internet-based business, and that even if it did, the statute is ambiguous and the rule of lenity should apply. *See* Mot. to Dismiss Count Four of the Superseding Indictment [Dkt. # 119] ("Second Mot. to Dismiss"). The court never ruled on that motion.

On July 21, 2008, before the second motion to dismiss was decided, petitioners entered guilty pleas.

- The two entities pled to Counts One and Two, E-Gold Plea Agreement [Dkt. # 136] at 1; GSR Plea Agreement [Dkt. # 133] at 1;

---

2    "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (citations omitted).

- Douglas Jackson pled to Counts One and Three, D. Jackson Plea Agreement [Dkt. # 139] at 1; and

- Reid Jackson and Downey pled to Count Four, R. Jackson Plea Agreement [Dkt. # 130] at 1; Downey Plea Agreement [Dkt. # 142] at 1.

On December 16, 2008, all of the petitioners were sentenced, *see* Judgments [Dkt. ## 180, 182, 184, 186, 189], and those sentences have been completed.[3]

Eight years later, in 2016, the D.C. Department of Insurance, Securities, and Banking issued an opinion finding that a different digital currency business, which petitioners assert was "extremely similar" to E-Gold, was *not* required to register under the D.C. Money Transmitters Act. Mem. of P. & A. in Supp. of Pet. [Dkt. # 211-1] ("Pet. Mem.") at 12; Ex. 12 to Pet. [Dkt. # 211-13]. This opinion prompted petitioners to submit public records requests to the D.C. agency and the Florida Office of Financial Regulation ("OFR") asking if either agency had ever considered whether petitioners were required to register as a money transmitter. *See* Pet. Mem. at 13. DISB produced no materials in response, but the Florida agency produced a number of documents and emails. *See* Exs. to Pet.

Among the materials it produced was a draft legal opinion prepared by OFR Assistant General Counsel William Oglo in 2006, opining that a court might rule that petitioners were not engaged in the transmission of funds under the Florida statute. *See* **draft** Informal opinion re whether the activities of e-gold, and GSR are subject to regulation by Chapter 560l Florida Statutes

---

3   The two entities were each sentenced to thirty-six months of probation and a $300,000 fine. E-Gold Judgment [Dkt. # 180], GSR Judgment [Dkt. # 182]. Reid Jackson and Downey each received suspended sentences of 180 days' incarceration and thirty-six months of probation. Downey Judgment [Dkt. # 184]; R. Jackson Judgment [Dkt. # 186]. Douglas Jackson was sentenced to time served and thirty-six months of supervised release. D. Jackson Judgment [Dkt. # 189]. Thus, none of the petitioners were held in custody after the entry of the judgments. *See* Pet. Mem. at 15 n.5.

(Oct. 25, 2006), Ex. 8 to Pet. [Dkt. # 211-9] ("OFR Draft") (emphasis in original).  The author noted that "much of the information about [E-Gold's and GSR's] operations is based upon their assertions and a magazine article" and "[t]o the writer's knowledge, . . . not verified by a governmental authority or other institutional authority which is carries [sic] general acceptance with the business community." *Id.* at 1 n.1.  With this caveat, the author opined that a court might consider the Florida money transmitting statute to be a criminal statute and apply the rule of lenity to petitioners:

> Based upon the description of the e-gold business model as it is currently known and described herein, this writer believes [the] position, that funds are not being transmitted, is more appropriate. This is based upon the possibility that a court might determine that the statute authorizing the Office to seek fines for unregistered money transmitting is a penal statute. Penal statutes are strictly construed.

*Id.* at 3.  The final page of the draft has a signature block that reads:  "**Approved by:**" in bold text, with four signature lines for other officials in the agency.  *Id.* at 4.  All of the signature lines are blank, and there is no indication in the record that the draft was ever finalized or signed by the four required signatories.  *See id.* at 4.

On July 2, 2020, petitioners filed the petition for writ of *coram nobis* pending before the Court.  Pet. at 1.  On February 16, 2022, the Magistrate Judge recommended that the petition be denied.  *See* R. & R. [Dkt. # 217] ("Report" or "R&R").  Petitioners objected, and the objections have been fully briefed.  *See* Pets.' Objs. to R&R [Dkt. # 218] ("Objs."); Resp. to Objs. [Dkt. # 223], Reply in Supp. of Objs. [Dkt. # 226].

5

## ANALYSIS

I.   **Applicable Standard and Law**

Once a magistrate judge issues a Report and Recommendation, any party may file written objections within fourteen days. LCrR. 59.2(b). "The objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for the objection." *Id.* A court's review of objections to a Report and Recommendation is made *de novo* as to "those portions of a magistrate judge's findings and recommendations to which objection is made as provided in paragraph (b)." LCrR. 59.2(c). "A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the magistrate judge, or may recommit the matter to the magistrate judge with instructions." *Id.*

"The writ of *coram nobis* is an ancient common law remedy" that was used "'to correct errors of fact.'" *See United States v. Denedo*, 556 U.S. 904, 910 (2009), quoting *United States v. Morgan*, 346 U.S. 502, 507 (1954). "A petition for a writ of *coram nobis* provides a way to collaterally attack a criminal conviction for a person . . . who is no longer 'in custody' and therefore cannot seek *habeas* relief under 28 U.S.C. § 2255 or § 2241." *United States v. Newman*, 805 F.3d 1143, 1146 (D.C. Cir. 2015), quoting *Chaidez v. United States*, 568 U.S. 342, 345 n.1 (2013).

"In federal courts the authority to grant a writ of *coram nobis* is conferred by the All Writs Act, which permits 'courts established by Act of Congress' to issue 'all writs necessary or appropriate in aid of their respective jurisdictions.'" *Denedo*, 556 U.S. at 911, quoting 28 U.S.C. § 1651(a). It is an "extraordinary remedy" granted "only under circumstances compelling such action to achieve justice." *Morgan*, 346 U.S. at 511; *Denedo*, 556 U.S. at 912 ("[C]oram nobis is . . . an extraordinary tool to correct a legal or factual error, . . . properly viewed as a belated

extension of the original proceeding during which the error allegedly transpired."); *id.* at 916 (stating that "judgment finality is not to be lightly cast aside"); *Zhenli Ye Gon v. Lynch*, 176 F. Supp. 3d 1, 3 (D.D.C. 2016) (*coram nobis* relief "is rarely available").

The petitioner bears the burden of overcoming a presumption that the challenged judicial proceedings were correct. *Morgan*, 346 U.S. at 512. And "those who have pled guilty are subject to higher standards for issuance of *coram nobis*." *Murray v. United States*, 704 F.3d 23, 32 (1st Cir. 2013) (emphasis added), citing *United States v. George*, 676 F.3d 249, 256–57 (1st Cir. 2012).

"[T]he precise contours of *coram nobis* have not been 'well defined,'" *Denedo*, 556 U.S. at 910, quoting *Bronson v. Schulten*, 104 U.S. 410, 416 (1882), and although the D.C. Circuit has not set out a specific test to be applied to *coram nobis* petitions, "[s]ome circuits have relied upon a four-part analysis to assist the courts in applying their discretion." *United States v. Hansen*, 906 F. Supp. 688, 692 (D.D.C. 1995), citing *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987); *Klein v. United States*, 880 F.2d 250, 254 (10th Cir. 1989); *United States v. Osser*, 864 F.2d 1056, 1059–60 (3d Cir. 1988); *United States v. Mandel*, 862 F.2d 1067, 1077 (4th Cir. 1988); *see also United States v. Riedl*, 496 F.3d 1003, 1006 (9th Cir. 2007) (applying same test). Under this analysis, a petitioner seeking a writ of *coram nobis* must show that

> (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.

*United States v. Faison*, 956 F. Supp. 2d 267, 269 (D.D.C. 2013), quoting *Hansen*, 906 F. Supp. at 692–93.

The decision to grant relief under a writ of error *coram nobis* is "committed to the discretion of the Court; federal judges may exercise their discretion by granting relief to correct serious defects underlying the conviction or sentence if those defects were not correctable on appeal or where exceptional circumstances otherwise justify such relief." *Hansen*, 906 F. Supp. at 692, citing *United States v. McCord*, 509 F.2d 334, 341 (D.C. Cir. 1974); *see also United States v. Hill*, 132 F.3d 1482 (D.C. Cir. 1997) (ruling that district court did not abuse its discretion in denying petitioner's motion for a writ of error *coram nobis*).

## II. Discussion

In their request for a writ of *coram nobis*, petitioners ask the Court to vacate their convictions on the ground that the prosecution failed to disclose the Florida Office of Financial Regulation draft opinion, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Pet. Mem. at 22–26; R&R at 7. *Brady* requires prosecutors to disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Courts apply a three-part test to determine whether a *Brady* violation has been committed: (1) the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) it "must have been suppressed by the state, either willfully or inadvertently;" and (3) "prejudice must have ensued." *United States v. Robinson*, 68 F.4th 1340, 1347–48 (D.C. Cir. 2023), quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Petitioners assert that all three elements have been established so the Magistrate Judge's finding to the contrary should be rejected. *See* Objs. They also ask the Court to order the government to review its file for *Brady* material. Objs. at 1–2. After reviewing the matter *de novo*, the Court is of the view that the Magistrate Judge got it right.

### A.     The OFR Draft is Not Exculpatory

With respect to the first element of the *Brady* analysis, the Magistrate Judge found that the draft informal legal opinion was not exculpatory. R&R at 10–11. Petitioners object to that finding, arguing that the analysis is favorable to them because – as they say the Magistrate Judge observed – Florida's statute is "nearly identical" to the D.C. statute. Objs. at 5–6, citing R&R at 10–11; *see id.* (arguing the Report confuses "the weight of the evidence with its favorable tendency"), quoting *Kyles v. Whitley*, 514 U.S. 419, 451 (1995). Here petitioners are mischaracterizing the Report: the language petitioners quote merely recites their own description of the statutes. *Compare* Objs. at 5 ("the Magistrate Judge notes that the application of Florida money transmitter law does not axiomatically determine the application of D.C.'s 'nearly identical' money transmitter law"), *with* R&R at 10 ("Petitioners justify this by claiming that both money transmission statutes are nearly identical.").

More importantly, even if one could fairly say that the state statutes are similar, the Court agrees that the newly uncovered Florida OFR Draft is not material to petitioners' guilt or punishment. *See* R&R at 11–12; *Brady*, 373 U.S. at 87. At the outset, it is notable that the document at issue does not contain new facts that could have been introduced at trial or in mitigation at sentencing; it is a government lawyer's assessment of a legal issue. *See* OFR Draft. And of particular relevance here, the document analyzed petitioners' liability under a statute that they were not charged with violating in this case. *Id.* Moreover, as the Report correctly found, there is no indication OFR ever finalized or adopted the draft: "the author labeled the opinion with a '***draft***' header [a]nd the Draft OFR Opinion's signature block for supervisory approval was left unsigned." R&R at 7 (internal citation omitted); *see* OFR Draft (using bold, italicized, large font in header). Finally, the author conceded that his analysis was based on limited factual information

9

about petitioners' operations, that is, petitioners' own descriptions of the nature of their business in promotional materials, OFR Draft at 1 n.1, 3, while the indictments were based on detailed allegations about the nature of the petitioners' business developed in the course of a criminal investigation, including allegations that E-Gold took steps to make it appear, falsely, that it was actually located offshore and not subject to government regulation. Superseding Indictment ¶¶ 19, 33.

What could petitioners have done with the document? They submit that if they had the draft, it would have "figured prominently" in their motion to dismiss Counts Two through Four and informed the court's analysis of the motion. Pet. Mem. at 10. But federal courts "are not bound by a state court's interpretation of a similar – or even identical – state statute," much less, a draft legal opinion prepared by a state regulatory lawyer about a different state's statute. *Johnson v. United States*, 559 U.S. 133, 138 (2010) (analyzing federal statute); *see also Army & Navy Club v. District of Columbia*, 8 App. D.C. 544, 547–48 (D.C. Cir. 1896) (observing that citations to cases regarding laws from other jurisdictions "are not binding upon us, and their persuasive force is necessarily weakened by the fact that each of them must depend upon the construction that must be given a statute which operates only within its own jurisdiction").

And petitioners did not await the outcome of their pending motions to dismiss the state law count before entering their guilty pleas. The two entities pled guilty to Count One, conspiracy to commit money laundering, which did not depend on the federal or state money transmitting statutes at all, and Count Two, conspiracy to violate the federal prohibition against operating an unlicensed money transmission business. E-Gold Plea Agreement at 1; GSR Plea Agreement at 1. State law was not involved. Douglas Jackson, the founder, CEO, and majority owner of E-Gold and GSR, pled guilty to the money laundering conspiracy and the substantive federal money

10

transmitting business offense. Jackson Plea Agreement at 1. Count Four, based on state law, was dismissed in each of their cases, and it was only the two other company officials, Reid Jackson and Downey, who were convicted of money transmission without a license in violation of D.C. law. R. Jackson Plea Agreement at 1; Downey Plea Agreement at 1.

This means that there was no trial, and there were no completed legal proceedings with respect to the validity of the state charge. Under those circumstances, and since we do not know what the agency itself or any court in the state of Florida would have done with the author's draft thoughts, or how or whether the district court here would have found the analysis based on limited facts helpful in this case, the Court finds that the draft memorandum prepared by a Florida OFR lawyer offers little that would have been exculpatory in connection with the state law charge against the petitioners.

Also, petitioners did have the opportunity to challenge the legal basis for the federal charges against them before they made the decision to enter a plea, and the state statutes did not enter into the court's decision to deny those motions. The Report correctly observes that petitioners litigated whether they operated an unlicensed money transmitting business under the federal statute at issue in this case; they moved to dismiss Counts Two and Three on the ground that E-Gold was not a money transmitting business under 18 U.S.C. § 1960, and the motion was denied. R&R at 11, citing First Mot. to Dismiss; Mem. Op.

Section 1960 imposes criminal liability on anyone who "knowingly conducts, controls, manages, supervises, directs or owns all or part of an unlicensed money transmitting business," 18 U.S.C. § 1960(a) (2008), and it defines "unlicensed money transmitting business" to mean "a money transmitting business which affects interstate or foreign commerce in any manner or degree and" –

11

> (A) is operated without an appropriate money transferring license in a State where said operation is punishable as a misdemeanor or a felony under State law, . . .
>
> (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or
>
> (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity; . . . .

18 U.S.C. § 1960(b)(1).

According to petitioners, the OFR Draft absolved them of violating the first prong, 18 U.S.C. § 1960(b)(1)(A). *See* Pet. Mem. at 23 ("The Florida OFR Legal Opinion represents a determination by a state regulatory agency that Petitioners were not required to register as money transmitters under applicable state law and therefore did not violate state law by operating the E-gold System without such registration.").

Putting aside whether one lawyer's draft opinion could qualify as an agency "determination," and whether it could serve to "exonerate" anyone of violating a different statute, the Florida opinion is of little comfort since the two unlicensed money transmitting business counts in the indictment were not predicated on a violation of section 1960(b)(1)(A) alone; the superseding indictment also charged that the business "failed to comply with the money transmitting business requirements under Section 5330 of Title 31 . . . and regulations prescribed thereunder," and that it "otherwise involved the transportation and transmission of funds that are known to the defendant to have been derived from a criminal offense and are intended to be used to promote and support unlawful activity." Superseding Indictment ¶¶ 50, 78. And in denying the motion to dismiss, the court ruled that the government had alleged a violation of the second prong of the statute. Mem. Op. at 19 ("According to the plain language of the statute, therefore,

12

Defendants e-Gold and GS&R, who according to the Indictment allegedly engage in the transmission of funds, must be registered, individually or jointly, with the Department of Treasury . . . under Section 5330."). So even assuming the OFR Draft presented favorable information with respect to whether the petitioners had violated the first prong of section 1960, that prong was not the basis of either the petitioners' argument or the court's ruling on the first motion to dismiss.

No matter, argue the petitioners: the question is not whether the OFR Draft would have altered the court's analysis but "what reasonably might have happened" if the government had not, as they claim, "suppressed" the draft. Objs. at 8–13 (asserting that the Report's assessment of materiality goes to the "prejudice" element of a *Brady* violation). If they had the draft, they contend that they "would have known they had a complete defense to at least one of the three prongs of § 1960" and rejected the plea offers. *See id.*, citing *United States v. Bagley*, 473 U.S. 667, 682 (1985).

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. The Court cannot find that petitioners' post-hoc speculation adds up to a "reasonable probability" that the outcome would have been different since the draft opinion was only of assistance with one of the three prongs of the federal statute and it offered nothing with respect to the money laundering count.

A defendant's decision "to enter into a plea bargain . . . counts against finding an error of the most fundamental character." *George,* 676 F.3d at 257. The two corporate entities and Douglas Jackson pled to crimes that do not implicate the D.C. money transmitting statute at all, and the other two petitioners who pled to violating the D.C. statute avoided the three other, far

13

more serious charges.  As the Magistrate Judge's Report correctly observes, E-Gold, GSR, and Douglas Jackson pled to the alternative prongs of section 1960 and the more serious 1956 violation, so their pleas did not depend on and were not predicated on a violation of the D.C. statue.[4] R&R at 12–13; *see* GSR Statement of Offense [Dkt # 134] at 7–8; E-Gold Statement of Offense [Dkt. # 137] at 8 (admitting, among other things, that the entities, through their "officers and employees, conducted funds transfers upon the request of its customers, believing that the funds involved were the proceeds of unlawful activity, namely child exploitation"); D. Jackson Statement of Offense [Dkt. # 140] at 6 (admitting that he knowingly failed to comply with the money transmitting business registration requirements section 5330, transmitted funds he knew were from criminal offenses and intended to be used to promote and support unlawful activity, and knowingly conducted financial transactions that "involved the proceeds of a specified unlawful activity . . . with the intent to facilitate" unlawful activity, "believ[ing] that the property involved in the financial transactions represented the proceeds of some form of unlawful activity").

And while petitioners Downey and Reid Jackson pled to violating the D.C. statute, "[u]ndeniable advantages, such as limiting exposure to punishment," flow from a defendant's decision to plea.  *George*, 676 F.3d at 256.  The government agreed to drop the three other, more serious charges against Downey and Reid Jackson in exchange for a plea to violating the D.C. statute.  Further, the two petitioners admitted under oath that they were "aware of e-gold operation's activities and that it was not licensed or registered as a money transmitting business with the District of Columbia." Downey Statement of Offense [Dkt. # 143] at 4; R. Jackson

---

4   Section 1960 carries a maximum sentence of five years of imprisonment, 18 U.S.C. § 1960(a), and section 1956 carries a maximum sentence of twenty years.  18 U.S.C. § 1956(a).

Statement of Offense [Dkt. # 131] at 4. Given this, the Court cannot find that there is a reasonable probability that the outcome would have been different if those two petitioners had the OFR Draft in hand. *See* R&R at 14 n.5; *Bagley*, 473 U.S. at 682.

### B. The OPR draft was not suppressed by the prosecution.

The Report and Recommendation correctly finds no indication that the federal government had access to or constructive control over the OFR draft, R&R at 9 n.3, and petitioners do not contest this. Rather, they assert that Florida's OFR was acting on the government's behalf and it suppressed the draft. Objs. at 6.

Information in the control of a third party does not fall within the government's disclosure obligations under *Brady* unless the third party is "acting on the government's behalf." R&R at 9 n.3, citing *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 892 (D.C. Cir. 1999). "Evidence is not suppressed when it is in the possession of a third-party who is not 'part of the prosecution team.'" R&R at 9, n.3, quoting *United States v. Spencer*, 873 F.3d 1, 9 (1st Cir. 2017).

The Report found it "unclear" whether the OFR Draft was suppressed within the meaning of *Brady*. R&R at 9 n.3. Petitioners contend this ambivalent conclusion is "not consistent with the facts demonstrated in the Petition," citing a number of communications between Florida and federal officials. Objs. at 2–3. While the emails do reflect some communication between federal investigators and state regulators, they do not indicate that the federal team was directing the activities in the state.

Petitioners cite a May 19, 2006 email from a Florida official to a federal agent which they assert shows that prosecutors "instructed" OFR not to communicate with petitioners and not to issue the OFR draft. Objs. at 3, citing Ex. 2 to Pet. [Dkt. # 211-3]. In the email, a Florida official advises the agent that the state's investigators had not interviewed any of the petitioners "due to

15

your request in late January to not correspond with Mr. Jackson or his staff. You explained that your investigative team did not want to give Mr. Jackson the opportunity to boast about his cooperation in resolving complaints and assisting government regulators." Ex. 2 to Pet. While that portion of the email shows federal and Florida officials were communicating and cooperating on their separate investigations into petitioners, its full text demonstrates that the Florida official had been directed by his superiors not to pursue the matter at that time:

> I have talked recently with my supervisor and our administrators in Tallahassee about trying to pursue the two complaints I have complaining of missing funds from their E-gold accounts, including the latest complaint I forwarded to you regarding Robert Donald, the investment trader from New York. They have asked me to not pursue my complaints directly with G&SR or E-gold, Ltd., until a decision is made by our Legal Department on whether we have jurisdiction over their business operations. . . . I hope we will soon have a legal opinion determining whether they and all of the exchange outlets meet our definition of a funds transmitter and/or currency exchanger, under Chapter 560 of the Florida Statutes.

Ex. 2 to Pet. Thus, the email shows that Tallahassee, not federal officials, directed the state's timing and handling of its investigation.

Petitioners' other exhibits also undermine their contention that the federal government was directing OFR's actions. An OFR memorandum sent on May 15, 2006 – the day before the May 16, 2006 email above – instructed that an OFR attorney be assigned to analyze E-Gold's operations. *See* May 15, 2006 OFR memo, Ex. 3 to Pet. [Dkt. # 211-4] ("Assign an attorney to review the concept of E-Gold and give an opinion on whether the companies that offer E-Gold should register to be a licensed Money Transmitter."). Together, the two emails show that despite the federal agent's "request in late January to not correspond with Mr. Jackson or his staff," Ex. 2 to Pet., Florida officials were moving forward with their own investigation, on a timeline set by

16

state officials. The October 2006 OFR Draft appears to be the result of the May 15, 2006 instruction to have a legal opinion prepared.

Petitioners also point to an email sent four months later, in February 2007, maintaining that it shows "the Government wanted Florida OFR not to issue the OFR Opinion while they completed Petitioners' plea agreement." Objs. at 7, citing Ex. 9 to Pet. [Dkt. # 211-10]. But even if that is what the government wanted, the email does not show that Florida officials were "acting on the government's behalf." *In re Sealed Case No. 99-3096*, 185 F.3d at 892.

> Agent Dotson and AUSA Predi requested that OFR and the State of Florida continue to delay any declarations or Orders regarding the regulatory status of E-gold and related entities as possible money transmitters. Their actions are still under seal though they did want us to pass along to Tallahassee that their grand jury investigation is almost wrapped up, and they believe the final resolution will be very beneficial to the federal agencies and each of the states with money transmitter regulations.

Ex. 9 to Pet. Like the May 2006 email, this email reflects a request from one investigating entity to another. Further, there is no indication in it or any other exhibit provided by petitioners that the government knew what conclusion the lawyer assigned to draft an opinion had reached or that it prevented OFR from finalizing the draft, either at the time of the state's investigation or since. Instead, it appears that it was cautioning the state agency that the federal investigation was further along in the fact-gathering process.

In sum, petitioners do not show that Florida's OFR was "acting on the government's behalf" such that the OFR Draft fell within its *Brady* obligations. *In re Sealed Case No. 99-3096*, 185 F.3d at 892.

### C.     Miscellaneous Objections

Finally, petitioners provide a bullet point list of additional objections to the Report. Objs. at 15–16.

First, petitioners object to the characterization of the Superseding Indictment as containing anything more than allegations, noting, for example, that the Report states it "explained the individual petitioners had varying management roles in E-Gold and G&SR." Objs. at 16, citing R&R at 2. But they do not dispute the allegations, and there appears to be no question that the individual petitioners, in fact, had varying management roles in the corporate petitioners.

Next, they object to the Report's statement that the trial court "[held] that E-Gold was a 'money transmitting business' by the 'plain meaning of the statute and the obvious intent of Congress.'" Objs. at 16, quoting Report at 3. In denying petitioners' motion to dismiss, the court did "find that Counts Two and Three properly allege offenses of 18 U.S.C. §§ 371 and 1960," Mem. Op. at 2, and that "[d]efendants' alleged conduct, including, *inter alia*, transferring funds on behalf of the public by wire, qualifies them as a 'money transmitting business' under Section 1960." Mem. Op. at at 17. Further, each of the individual petitioners pled guilty to operating a "money transmitting business" under either federal or D.C. law. So the summary of the court's ruling is not so inaccurate as to warrant rejecting the Magistrate Judge's recommendation.

Petitioners next object to the characterizations of their Statements of Offense "to the extent those characterizations are inconsistent with the Statements of Offense themselves." Objs. at 16, citing Report at 4–5. But they do not identify statements they claim are mischaracterized nor how any alleged mischaracterizations affect their claim for relief.

Petitioners take issue with the Report's description of the OFR Draft as an "internal, informal summary of E-Gold's business and an assessment of whether a court would find E-Gold's conduct fell under Floridian money transmitting statutes." Objs. at 16, citing Report at 6. But in the Court's view, the Magistrate Judge's description appears to be entirely accurate, and in any

18

event, the Court is basing its opinion on the document itself, and not simply the Report's characterization of it.

Finally, petitioners object to the description of the D.C. DISB opinion as "concerning a 'virtual currency business (which allegedly operated similarly to the petitioners' business),'" Objs. at 16, quoting Report at 6, when, according to petitioners, "the payment model at issue in the DISB Opinion is materially indistinguishable from Petitioners' E-gold System," *id.*, citing Pet. Mem. at 12–13. But the D.C. opinion has no bearing on this decision.

In sum, none of the listed objections alters the Court's conclusion.

## CONCLUSION

For the reasons stated above, and in the exercise of its discretion, the Court hereby **ADOPTS** the Report and Recommendation [Dkt. # 217], and **DENIES** the petition for a writ of *coram nobis*. [Dkt. # 211].

This is a final, appealable order.

AMY BERMAN JACKSON
United States District Judge

DATE: November 1, 2024